[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 667 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 668 
We have for review Infinity Insurance Co. v. Berges,806 So.2d 504 (Fla. 2d DCA 2001), which expressly and directly conflicts with Government Employees Insurance Co. v. Grounds,311 So.2d 164 (Fla. 1st DCA 1975). We have jurisdiction. See
art. V, § 3(b)(3), Fla. Const.
This case concerns an insurer's fiduciary obligation to protect its insured from a judgment exceeding the limits of the insurance policy. An insurer's duty toward its insured was best summarized by this Court in 1980 in Boston Old Colony Insurance Co. v.Gutierrez, 386 So.2d 783 (Fla. 1980):
 An insurer, in handling the defense of claims against its insured, has a duty to use the same degree of care and diligence as a person of ordinary care and prudence should exercise in the management of his own business. For when the insured has surrendered to the insurer all control over the handling of the claim, including all decisions with regard to litigation and settlement, then the *Page 669 
insurer must assume a duty to exercise such control and make such decisions in good faith and with due regard for the interests of the insured. . . . The insurer must investigate the facts, give fair consideration to a settlement offer that is not unreasonable under the facts, and settle, if possible, where a reasonably prudent person, faced with the prospect of paying the total recovery, would do so. Because the duty of good faith involves diligence and care in the investigation and evaluation of the claim against the insured, negligence is relevant to the question of good faith.
Id. at 785 (citations omitted).
The jury in this case found that the insurer, Infinity Insurance Company, acted in bad faith toward its insured, Barry Berges. The conflict issue presented is whether an offer to settle a claim on behalf of a minor prior to court approval is invalid as a matter of law. We conclude that court approval is not a prerequisite to a valid settlement offer for a minor.
We also conclude that the jury's finding of bad faith was supported by competent, substantial evidence. In reaching this conclusion, we apply well-established and long-standing jurisprudence in this State, and focus on the insurer's fiduciary obligation to its insured. Accordingly, we quash the Second District Court of Appeal's decision in Berges and remand for reinstatement of the final judgment.
 I. FACTS AND PROCEDURAL HISTORY
In Berges, the Second District summarized the facts as follows:
 On March 29, 1990, a vehicle driven by Marion Taylor collided with a vehicle owned by Berges but driven by a friend. The collision killed Marion Taylor and seriously injured her minor daughter, who was a passenger in the car. Berges was covered by an Infinity automobile insurance policy that had bodily injury limits of $10,000 per person and $20,000 per accident.
806 So.2d at 506. By April 30, 1990, Infinity had conducted an independent investigation of the accident. The investigator concluded that the driver of Berges' car had been intoxicated when crossing the center line and was "100%" at fault. The investigator also confirmed that Mrs. Taylor died as a result of the accident and her minor daughter sustained severe injuries generating more than $30,000 in medical bills.
 [O]n May 2, 1990. . . . [Mr.] Taylor personally delivered to Infinity a hand-written letter offering to settle his wife's estate's death claim for the $10,000 policy limits and his daughter's personal injury claim for the $10,000 policy limits. He advised that his attorney had filed a petition seeking Taylor's appointment as personal representative of his wife's estate. However, he conditioned the settlement offer on the requirement that Infinity pay the estate's settlement amount within twenty-five days (by May 27, 1990), and the minor's claim by June 1, 1990. He agreed that the estate's funds could be paid to him personally or as personal representative. As an alternative, Taylor suggested that Infinity place the settlement funds in separate interest bearing accounts. Finally, he acknowledged that while it may take "special papers to be filed in court" to settle the minor's claim, he promised to work with the insurance company's lawyers to accomplish this.
Id.
Taylor advised Infinity that he needed the money paid on the claims within the time frames because he had missed a great deal of work due to the accident and was "getting doctor bills almost every day" for the injuries to his daughter, who was "hurt *Page 670 
very bad" in the accident. Taylor stapled some of the medical bills to the letter and told Infinity that he anticipated many more, especially because his daughter had scarring from the surgery and the accident. Infinity did not send Berges a copy of Taylor's written offer to settle or otherwise inform Berges that a settlement offer had been submitted.
After obtaining authority from his supervisor, Infinity's claims adjuster, Robert Fryer, telephoned Taylor on May 11, 1990. Although the exact details of the telephone conversation were a source of conflict at trial, it is undisputed that at some point Fryer informed Taylor that Infinity was willing to pay the policy limits to settle the wrongful death and bodily injury claims. Fryer's handwritten notes of the conversation reflect that he informed Taylor that court approval would be necessary, that Infinity would pay and arrange for the paperwork and the court approval, and that Fryer would meet with Infinity's attorney on May 14, 1990, to discuss the details of the settlement.
What was disputed at trial is whether Taylor agreed to an extension of the time limits for the payment of the money as set forth in his May 2 demand letter. Infinity took the position at trial that the agreement reached during the May 11 conversation did not include paying the policy limits within Taylor's time deadlines. However, in contrast to Infinity's position, Taylor testified that Fryer had not requested that the deadline be extended or suspended and that he, Taylor, had not agreed to a change in the time limits.
The May 11 telephone conversation was the only contact between Taylor and Infinity subsequent to Taylor's May 2 delivery of his written offer to settle. The scheduled May 14 meeting between Fryer and Infinity's attorney regarding the details of the settlement never took place. Fryer did not inform Taylor that the meeting had not occurred.
On May 16, 1990, Infinity retained the services of an attorney, Kevin Korth, to seek the court's approval of the settlement claims involving Taylor's minor daughter. Contrary to Infinity's position at trial that the payment deadlines imposed by Taylor had been suspended after the May 11 conversation, Fryer told Korth in the May 16 retainer letter that Infinity was operating under a "time demand" as outlined by Taylor's May 2 letter, which Fryer enclosed for Korth's review. In fact, consistent with the understanding that Infinity was operating under a "time demand," Korth phoned Fryer on May 23 and informed him that there was a problem with obtaining the necessary court approvals and completing the settlement within the time period. An interoffice memorandum dated May 23, 1990, from Korth to his legal assistant also confirms that Korth was operating under the belief that the settlement should be completed "fairly quickly [because Taylor] lost his wife and his daughter was hurt very seriously and they are very intent on getting their money as quickly as possible."
Korth finally wrote to Taylor on May 24, 1990, thirteen days after the May 11 telephone conversation with Infinity, and only three days before the time limit to pay the wrongful death claim expired and seven days before the time limit to pay the minor's claim expired. In this letter, Korth advised Taylor only that Infinity was agreeing to pay the policy limits and that Korth was preparing the guardianship papers. Due to an incorrect zip code, the letter did not reach Taylor until June 20, 1990, after the settlement deadlines had expired. Thus, despite Fryer's assurances to Taylor on May 11, 1990, that Infinity would be in contact, Taylor did not hear from Infinity again until after the deadlines *Page 671 
for settlement, when the letter was finally received.
On June 11, 1990, Taylor's attorney, Dale Swope, wrote to Infinity to advise Infinity that Taylor's May 2 written offer to settle was revoked due to Infinity's failure to pay the claims within the time prescribed in the letter. Swope then filed a wrongful death action against Berges on behalf of the estate as well as a personal injury claim on behalf of the minor.
Almost one month after the settlement deadlines expired, Infinity advised its insured, Berges, for the first time about the possibility of an excess judgment and his right to retain independent counsel. In a postscript, Infinity told Berges "that we have offered to pay your policy limits of $20,000 for the above claim, but Mr. Taylor refused to settle for that amount." The postscript did not mention the settlement deadlines and other terms of Taylor's May 2 written offer.
The case proceeded to trial on the wrongful death claim and the personal injury claim involving Taylor's minor daughter. The jury returned a $911,400 verdict in favor of the estate on the wrongful death claim and a $500,000 verdict on the personal injury claim involving the minor. As a result of these combined verdicts that far exceeded his policy limits, Berges filed a bad faith complaint against Infinity. The trial court denied in part Infinity's motions for summary judgment.[1] At trial, the jury was instructed on Berges' claims of bad faith for failing to settle and for failing to advise the insured of the settlement offer. The trial court gave the jury the standard bad faith jury instruction, which provided:
 The issue for your determination is whether Infinity Insurance Company acted in bad faith in failing to settle the claims of the Estate of Marion Viola Taylor and Christine Michelle Taylor against Barry L. Berges. An insurance company acts in bad faith in failing to settle a claim against its insured within its policy limits when, under all of the circumstances, it could and should have done so, had it acted fairly and honestly towards its insured and with due regard for his interests.
Fla. Std. Jury Instr. (Civ.) MI 3.1. The jury was separately instructed on the insurer's duty to advise its insured:
 The duty of good faith obligates an insurer to advise the insured of settlement opportunities, to advise as to the probable outcome of the litigation, to warn of the possibility of an excess judgment, and to advise the insured of any steps he might take to avoid the same.
The jury returned a verdict finding that Infinity acted in bad faith with respect to Taylor's claims against Berges. Based on that verdict, the trial court entered a $1,893,066.41 amended final judgment in favor of Berges.[2]
Infinity appealed the trial court's judgment and the Second District reversed. According to the district court, because Taylor had neither been appointed personal representative of his wife's estate nor been given court approval for the proposed settlement of his minor daughter's claim, he was without authority to make a valid *Page 672 
settlement offer to Infinity. See Berges, 806 So.2d at 508. The Second District concluded that because Taylor did not present Infinity with an offer that would protect its insured, Infinity could not have acted in bad faith as a matter of law. See id.
Berges petitioned this Court for review, alleging express and direct conflict with Grounds, in which the First District Court of Appeal held that the lack of court approval prior to making an offer to settle a minor's claim did not, as matter of law, preclude a finding of bad faith. See 311 So.2d at 167-68. This Court granted review to resolve this conflict.
 II. ANALYSIS
The conflict issue presented for our review is whether an offer to settle a claim is invalid as a matter of law if the claimant has not obtained necessary court approvals of the settlement prior to making the offer. Relying on the Fifth District Court of Appeal's decision in Williams v. Infinity Insurance Co.,745 So.2d 573 (Fla. 5th DCA 1999), the Second District reasoned that without the necessary court approvals, Taylor did not present Infinity with an offer to settle that would protect its insured.See Berges, 806 So.2d at 508. Berges contends that the Second District's holding is directly contrary to Grounds, in which the First District held that the issue of whether an insurer acted in bad faith in failing to settle a minor's claim even though court approvals were necessary is a jury question.
We begin with the general law of bad faith. It has long been the law of this State that an insurer owes a duty of good faith to its insured. See Gutierrez, 386 So.2d at 785. Thus,
 [t]he insurer must investigate the facts, give fair consideration to a settlement offer that is not unreasonable under the facts, and settle, if possible, where a reasonably prudent person, faced with the prospect of paying the total recovery, would do so.
Id.
In concluding that Taylor's offer was invalid as a matter of law because he had not obtained the necessary court approvals prior to making the offer to settle, the Second District reasoned that Taylor's offer "was merely an expression of his intent to settle once he became authorized to make an offer. As of May 2, he could neither sign the release nor assure Infinity that if it, in fact, performed in any way, all of the claimants would be bound by the offer." Berges, 806 So.2d at 508-09. According to the Second District, "Since Infinity had no reasonable opportunity to settle the claim, Infinity could not have acted in bad faith as a matter of law." Id. at 508.
We conclude that the Second District's reasoning is flawed. Although certainly the purpose of an insurer's obligation to act in good faith is to protect an insured from an excess verdict, an offer to settle is not invalid simply because there is a requirement of subsequent court approval. Even Justice Cantero's dissent, which concludes that no settlement could be consummated, agrees that Taylor had the authority to make the offer to settle.See dissenting opinion at 690 (noting that Taylor "could legitimately offer to settle") (Cantero, J., dissenting). The question of bad faith in this case extends to Infinity's entire conduct in the handling of the claim, including the acts or omissions of Infinity in failing to ensure payment of the policy limits within the time demands.
The First District's reasoning in Grounds is more consistent with insurance bad faith law, which generally reserves the question of bad faith for the jury. See Gutierrez,386 So.2d at 785 ("The question of failure to act in good faith with due regard for the interests of the insured is *Page 673 
for the jury."); see also Campbell v. Gov't Employees Ins. Co.,306 So.2d 525, 530-31 (Fla. 1974) ("[R]easonable diligence and ordinary care [are] material in determining bad faith. Traditionally, reasonable diligence and ordinary care are considerations of fact — not of law.").
In Grounds, the First District permitted a jury to consider whether an insurer acted in bad faith in failing to respond to a time-limited settlement offer, even though the offer to settle did not specifically dispose of a potential claim by the U.S. Government for medical benefits and the claimant was a minor whose guardian needed court approval. 311 So.2d at 167-68. The accident which gave rise to the claim involved an automobile owned and driven by a minor, Geoffrey Nevils. There was never any contention that the insured was not liable for Nevils' injuries and damages. Indeed, an independent adjusting firm investigating the accident for the insurance company concluded that "it look[ed] bad because our driver was charged with DWI." Id. at 165. The insurer was later informed that the Government was making a claim under the Federal Medical Care Recovery Act for the cost of the treatment provided to Nevils, who, at the time, was a helicopter pilot student in cadet training. See id.
The attorney for Nevils wrote a time-demand letter to the insurer that detailed Nevils' injuries, pointed out that if the case went to jury trial the damage award would likely be in excess of the policy limits, and offered to settle within the policy limits. See id. at 166. The settlement offer stated that the offer would remain open for two weeks and expressly stipulated that any settlement would include the claim of the Government, with whom Nevils promised to settle directly. Seeid. The insurer neither responded to the offer within the two-week period for acceptance nor informed its insured of the offer. See id. at 167. Nevils eventually filed suit against the insurer and Grounds. See id. A jury awarded Nevils approximately $50,000 in compensatory damages above the $20,000 policy limits. See id. at 165, 167.
Grounds subsequently filed suit against his insurer, alleging bad faith failure to settle. See id. A jury awarded Grounds $55,019.63, the amount in excess of the policy limits plus interest and attorney's fees. See id. The insurer appealed and the First District affirmed the judgment, noting:
 The jury could properly weigh th[e] evidence and conclude that . . . appellant . . . would have known it was unquestionably liable and that the damages obviously exceeded the policy limits; that such failure by the insurer constituted bad faith toward its insured who as a result thereof was subjected to personal liability greatly in excess of the limits for which he was covered by the policy.
Id. at 167. In holding that the evidence was sufficient to support the jury's verdict, and thus that the judgment would not be reversed on appeal, the First District stated:
 Appellant also contends that Stafford's offer was necessarily contingent upon the government's claim being settled. . . . Had it agreed to settle for the policy limits, it could have done so subject to the government claim being settled and thus have avoided this additional liability.
 In addition, appellant contends that since Nevils was a minor, his claim could not have been settled without approval of the court. This is correct, but a settlement of a minor's claim could never be accomplished if insurance companies took this attitude. All such settlements must necessarily be subject to court approval.
 In the recent opinion of the Supreme Court in Campbell v. Government Employees *Page 674 Insurance Company, Fla., 306 So.2d 525, that court reversed this court's setting aside of a judgment for excess liability, holding that this court was not at liberty to substitute its judgment for that of the trier of facts since there was evidence to support the judgment. It stated:
 "Bad faith in a factual situation of this kind is not a matter of law but is a question of fact for the jury."
 It referred to Auto Mutual Indemnity Company v. Shaw, 134 Fla. 815, 184 So. 852, and stated:
 "We ruled . . . that such matters as reasonable diligence and ordinary care were material in determining bad faith. Traditionally, reasonable diligence and ordinary care are consideration of fact — not of law."
 The evidence is sufficient to support that jury's verdict and were we of a different view from that of the jury, we would not be authorized to substitute our judgment for theirs.
Id. at 167-68 (emphasis supplied); see also Kivi v. NationwideMut. Ins. Co., 695 F.2d 1285, 1287-88 (11th Cir. 1983) (applying Florida law and holding that an offer for settlement was not deficient because it did not specifically provide for the disposition of the omnibus insured's claim or for the release of subrogation rights and the hospital lien).
Consistent with the reasoning in Grounds, Florida courts have never considered court approval a prerequisite to a valid settlement offer for a minor. See Tucker v. Shelby Mut. Ins.Co., 343 So.2d 1357, 1359 (Fla. 1st DCA 1977) (settlement offer binding against minor even though acceptance of such offer required court approval), abrogated on other grounds asrecognized by Dudley v. McCormick, 799 So.2d 436, 440 n. 4 (Fla. 1st DCA 2001). Notably, in Bateski v. Ransom, 658 So.2d 630
(Fla. 2d DCA 1995), the Second District observed that a claimant's status as a minor was not a material element of a valid settlement offer. In holding that the parties had not reached a meeting of the minds regarding a minor's offer for settlement, the Second District specifically observed:
 The fact that Steven Bateski was a minor at the time of the offer does not control our decision in this matter. It is true that while Steven Bateski was a minor, the giving of a release form of any type would not have allowed the parties to conclude the matter since he and his mother would have had to cooperate in obtaining court approval of the settlement. That was not an essential term of any agreement, however, but was a contingency that did not affect the proposal in this instance.
Id. at 632 (emphasis supplied).
Furthermore, although Florida law requires a court-appointed guardian to settle any minor's claim in excess of $5000, see
§ 744.387(2), Fla. Stat. (Supp. 1990), guardianship law does not require the guardian to obtain court appointment and approval before negotiating a settlement.[3] Section 744.387(1), Florida Statutes (Supp. 1990), provides:
 When a settlement of any claim by or against the guardian, whether arising as a result of personal injury or otherwise, and whether arising before or after appointment of a guardian, is proposed, but before an action to enforce it is begun . . . the court may enter an order authorizing the settlement. . . .
(Emphasis supplied.)
Moreover, the statutory scheme governing estates similarly anticipates valid negotiations prior to court involvement. *Page 675 
Specifically, the legal acts of a personal representative relate back after court appointment, thereby validating the previous acts of the personal representative on behalf of the estate. SeeGriffin v. Workman, 73 So.2d 844, 846 (Fla. 1954) ("[W]here a wrongful death action was instituted by a party `as administrator,' his subsequent appointment as such validated the proceeding on the theory of relation back."); see also §733.601, Florida Statutes (1989).[4] Thus, the statutory schemes governing both minor and estate claims contemplate the completion of settlement negotiations prior to court approval. This scheme is consistent with the purposes of settlement, which are to simplify and shorten litigation, save costs to parties, and ease the burden on the courts by obviating the necessity of trial. See Bodek v. Gulliver Acad., Inc., 702 So.2d 1331, 1332
(Fla. 3d DCA 1997), abrogated on other grounds as recognized byDudley, 799 So.2d at 436, 440 n. 4; see generally Cunningham v.Standard Guar. Ins. Co., 630 So.2d 179, 182 (Fla. 1994) ("This Court has looked with favor upon stipulations designed to simplify, shorten, or settle litigation and save costs to parties.").
In support of the position that Taylor did not extend a valid offer to settle, the Second District and Infinity rely on the Fifth District's decision in Williams. We conclude thatWilliams is distinguishable from this case. Unlike Berges, the issue in Williams was whether the insurer was obligated to settle with the first beneficiary who claimed insurance proceeds to the exclusion of other potential beneficiaries. SeeWilliams, 745 So.2d at 574. In this case, Taylor's offer was an attempt to settle all potential claims against Infinity involving the estate and all three survivors for the policy limits. Indeed, Taylor was the husband of the decedent and natural father of both minor children, including the daughter who was severely injured in the accident. Moreover, unlike this case, in Williams the insurers did tender the policy limits, subject to the condition that the tender satisfy the claims of the entire estate. Seeid. at 575.
We thus conclude that the Second District erred when it concluded as a matter of law that Infinity could not be liable for bad faith towards its insured because Taylor did not make a valid offer to settle the case. Neither precedent nor the applicable statutes regarding settlements involving minors or on behalf of decedents require prior court approval for a valid settlement offer to be made. The focus in this case extends to Infinity's entire course of conduct in handling the claim and in failing to consummate the settlement and pay the policy limits within the time limits demanded by Taylor.
 III. WHETHER COMPETENT SUBSTANTIAL EVIDENCE SUPPORTS THE JURY'S VERDICT OF BAD FAITH
Having concluded that Taylor's offer did present Infinity with a valid opportunity to settle, we next address three additional issues raised in this case: (a) whether Infinity's agreement to pay the policy limits precludes a finding of bad faith as a matter of law; (b) whether the trial court erred in instructing the jury on the insurer's duty to advise of settlement opportunities in this case; and (c) whether, under the totality of the circumstances, competent, substantial evidence supports the jury verdict of bad faith.
In analyzing these issues, we adhere to the well-settled principle that an *Page 676 
appellate court will not disturb a final judgment if there is competent, substantial evidence to support the verdict on which the judgment rests. Indeed, it is not the function of this Court to substitute its judgment for that of the trier of fact. SeeCastillo v. E.I. Du Pont De Nemours Co., 854 So.2d 1264, 1277
(Fla. 2003) ("It is a basic tenet of appellate review that appellate courts do not reevaluate the evidence and substitute their judgment for that of the jury."); Carter v. Brown Williamson Tobacco Corp., 778 So.2d 932, 939 (Fla. 2000) (quoting Helman v. Seaboard Coast Line R.R. Co.,349 So.2d 1187, 1189 (Fla. 1977)) ("[I]t is not the function of an appellate court to reevaluate the evidence and substitute its judgment for that of the jury."); Grounds, 311 So.2d at 168
(stating that an appellate court is not authorized to substitute its judgment for that of the trier of fact).
 A. Whether Infinity's Agreement to Pay the Policy Limits Precludes a Finding of Bad Faith as a Matter of Law
As the basis for concluding that Infinity could not be liable for bad faith, the Second District held that Taylor lacked the authority to make the offer. However, Infinity and Justice Cantero's dissent present an alternative basis for concluding that Infinity cannot be liable for bad faith.[5]
Essentially, it is Infinity's position that because it agreedwithin the time deadlines to pay the policy limits, it had no obligation to consummate the settlement and actually pay the policy limits within the time deadlines. Thus, according to Infinity, it could not be liable for bad faith as a matter of law. We note that contrary to the Second District's holding in this case, Infinity and Justice Cantero assume for purposes of this issue that Taylor did have the authority to make an offer to settle his claims against Infinity's insured.
We reject Infinity's argument that, because it agreed within the time deadlines to pay the policy limits, the issue of bad faith should be decided as a matter of law. To the contrary, because this issue concerns disputed issues of material fact, we conclude that it was properly submitted to the jury.
Infinity's argument on this issue is two-fold. First, Infinity asserts that Taylor's time deadlines were suspended after the May 11 conversation. Consistent with Infinity's position, Fryer testified at trial that Infinity's May 11 offer to pay the policy limits, which Taylor accepted, did not include the time deadlines for payment. However, Fryer's testimony was contradicted by Taylor at trial. Taylor testified that his understanding of the May 11 conversation was that Infinity was accepting the terms of his demand letter and going to work to obtain the court approvals and pay the policy limits within the time frames set forth therein.
We note that neither Fryer nor Korth, the attorney retained by Infinity, memorialized in writing their understanding that the time deadlines for consummation of the settlement were not in effect after May *Page 677 
11. In fact, Infinity's internal memoranda regarding the claim supports Taylor's position that the deadlines remained applicable. The May 16 retainer letter from Fryer to Korth specifically references the May 2 time demand letter from Taylor. A copy of Taylor's letter was enclosed for Korth's review. Fryer's notes of a May 23, 1990, telephone conversation between Fryer and Korth indicate that, as of that date, Korth and Fryer were both working under the impression that court approvals and settlement needed to be completed under the terms of Taylor's May 2 demand letter.[6] In an interoffice memo to his legal assistant, Korth urges that the settlement be completed quickly because "the man lost his wife and his daughter was hurt very seriously and they are very intent on getting their money as quickly as possible." The thirty-day report written May 29 by Fryer's supervisor, Bobbi Hall, specifically referenced Taylor's time limits. Finally, even the misaddressed letter to Taylor from Korth indicating that Infinity was agreeing to pay the policy limits failed to set forth Infinity's position that court approvals and payment could not or would not occur within the time deadlines. Therefore, even if Taylor had received the letter, he would not have known that Infinity did not intend to complete the settlement within the time deadlines. In light of this evidence, we conclude that the issue of whether the time deadlines remained in effect after the May 11 conversation was properly submitted to the jury.
Second, Infinity argues that it should not be liable for bad faith as a matter of law because it was impossible to obtain the necessary court approvals and conclude the settlement within the time periods proposed by Taylor. In this regard, both Justice Cantero's description of the deadlines as "arbitrary" and Justice Wells' characterization of the deadlines as "artificial" reflect Infinity's argument on this point. However, the focus in a bad faith case is not on the actions of the claimant but rather on those of the insurer in fulfilling its obligations to the insured. See generally Gutierrez, 386 So.2d at 785. In fact, Infinity owed a fiduciary duty to act in Berges' best interests.See Doe v. Allstate Ins. Co., 653 So.2d 371, 374 (Fla. 1995) (stating that the obligation of insurance company toward insured is a "fiduciary duty requiring the exercise of good faith"). We conclude that the issue as to whether Infinity could have met the deadlines if it had acted with due regard for the interests of its insured was properly submitted to the jury and resolved as a material issue of fact. Cf. Powell v. Prudential Prop. Cas.Ins. Co., 584 So.2d 12, 14 (Fla. 3d DCA 1991) ("Whether Prudential's delay in responding to Goldner's attorney's requests and its failure to inform Powell of the ten-day deadline . . . were reasonable under the circumstances . . . are . . . material issues of fact to be submitted to the jury.").[7]
At trial, both parties presented expert testimony as to the feasibility of Taylor's *Page 678 
time-limited demand and Infinity's actions in light of that demand. Berges' experts testified that the time period was reasonable and that Infinity could have and should have been able to pay the policy limits within the time period, especially because the case involved "clearly outrageous liability" and "extreme damages." Berges' experts also stated that if Infinity anticipated that court approvals could not have taken place within the time limit, Infinity should have tendered the funds into interest-bearing accounts or requested a time extension from Taylor before the time period expired.
Consistent with the testimony of Berges' experts on this issue, we note that none of the internal memoranda regarding this claim generated by Infinity's representatives suggested that there was anything unreasonable about Taylor's time limits demand. To the contrary, the internal notes suggest that Infinity was working to complete the settlement within the time frame. Even assuming at some point Infinity realized it could not pay the money within the time periods, Infinity never conveyed this problem to Taylor. Infinity made no request that Taylor's deadlines be extended. Even after Korth informed Fryer on May 23 that there might be a problem with getting the court approvals in the remaining time period, Fryer did not notify Taylor of the difficulties or ask for an extension. In fact, even though the time limits required completion of the settlement by May 27 for the wrongful death claim and June 1 for the minor's claim, Taylor did not revoke the offer through his attorney until June 11.
Assuming Taylor's conduct is a factor to consider in deciding whether Infinity acted in bad faith toward its insured, the record is devoid of any evidence that Taylor was uncooperative or in any way hindered Infinity's attempts to obtain the court approvals. When Taylor delivered his May 2 demand letter, he had already taken steps to be appointed personal representative of his wife's estate.[8] Taylor also indicated that he was aware court approvals would be necessary and stated that he would work with Infinity's attorneys to obtain the approvals. Taylor reiterated that understanding during the May 11 telephone conversation. However, after the May 11 conversation, in which Infinity agreed that its attorneys would undertake the process of obtaining the necessary approvals, no one from Infinity ever contacted Taylor within the deadline to move the court process forward.[9] *Page 679 
Justice Wells, in his dissenting opinion, asserts that Taylor's conduct in this case evinces the use of "sophisticated legal strategies" employed to "create" bad faith claims against insurers, and that this Court should not sanction such conduct. Dissenting op. at 686 (Wells, J., dissenting). However, the jury could have found that the evidence established that Taylor's imposition of time deadlines constituted a genuine attempt to resolve the claims in an expeditious manner and that, for him, time was of the essence. Taylor advised Infinity that the deadlines were imposed because he had missed a great deal of work due to the accident, and he was "getting doctor bills almost every day" related to his daughter's injuries. Importantly, Infinity understood this to be the reason for Taylor's time deadlines. As Korth stated in an interoffice memo to his legal assistant, settlement needed to be completed quickly because "the man lost his wife and his daughter was hurt very seriously and they are very intent on getting their money as quickly as possible."
Finally, we note that Infinity's position that the lack of court approvals prevented it from consummating the settlement according to the terms of Taylor's May 2 demand is undermined by the fact that the demand presented Infinity with the option of tendering the funds into interest-bearing accounts pending court approval. Indeed, Taylor advised that if it was not possible to pay him directly within his proposed deadlines, the policy limits could be tendered into interest-bearing accounts. However, despite Taylor's suggestion to set up a "special account," Fryer testified at trial that he never considered or investigated the possibility of setting up a separate account until the proper court approvals could be obtained.
As the jury was instructed in this case, the issue is whether, under all of the circumstances, the insurer could and should have settled the claim within the policy limits had it acted fairly and honestly toward its insured and with due regard for his interests. In light of the foregoing evidence and accepting the facts in the light most favorable to Berges, we conclude that the question of whether Infinity acted in bad faith in failing to complete the settlement within the time deadlines, thereby insulating its insured from an excess judgment, was properly submitted to the jury.
 B. Whether Infinity Had a Duty to Advise Berges of Taylor's Settlement Offer
The Second District determined, as an alternative basis for reversing the judgment, that Infinity did not owe a duty to advise Berges of Taylor's offer because the "offer" contemplated settling within policy limits. See Berges, 806 So.2d at 510. We thus address Berges' argument that the Second District erred in holding that Infinity did not have a duty to inform and advise Berges of Taylor's offer for settlement.
Neither the Second District nor Infinity has cited a Florida case that supports the broad proposition that an insurer has no duty to inform its insured of a settlement offer that is within the policy limits.[10] The Second District's holding *Page 680 
misapplies this Court's precedent and is contrary to Gutierrez, in which this Court held that an insurer's duty of good faith specifically obligates it "to advise the insured of settlementopportunities, to advise as to the probable outcome of the litigation, to warn of the possibility of an excess judgment, andto advise the insured of any steps he might take to avoidsame." 386 So.2d at 785 (emphasis supplied). "Where the insured reasonably relies on the insurer to conduct settlement negotiations, and the insurer fails to disclose settlement overtures to the insured, the jury may find bad faith." Powell,584 So.2d at 14-15.
The duty to inform the insured of settlement opportunities is one of the duties subsumed within the duty of good faith owed by an insurer to an insured. The failure to inform the insured of the settlement offer does not automatically establish bad faith; it is simply one factor for the jury to consider in determining whether the insurer acted in bad faith. See id. at 14 (concluding that the "lack of a formal offer to settle does not preclude a finding of bad faith," but is merely one factor to be considered by the jury); Gen. Accident Fire Life AssuranceCorp. v. Am. Cas. Co., 390 So.2d 761, 765 (Fla. 3d DCA 1980) (same). Therefore, the Second District erred in ruling as a matter of law that Infinity did not breach its good faith duty to inform and advise Berges of settlement opportunities.
 C. Whether Competent Substantial Evidence Supports the Jury Finding of Bad Faith
Finally, we address whether competent, substantial evidence supports the jury's verdict that Infinity acted in bad faith. In Florida, the question of whether an insurer has acted in bad faith in handling claims against the insured is determined under the "totality of the circumstances" standard. See State FarmMut. Auto. Ins. Co. v. Laforet, 658 So.2d 55, 63 (Fla. 1995). Each case is determined on its own facts and ordinarily "[t]he question of failure to act in good faith with due regard for the interests of the insured is for the jury." Gutierrez,386 So.2d at 785; see also Campbell, 306 So.2d at 530-31 ("[R]easonable diligence and ordinary care [are] material in determining bad faith. Traditionally, reasonable diligence and ordinary care are considerations of fact — not of law.").
Although the issue of bad faith is ordinarily a question for the jury, this Court and the district courts have, in certain circumstances, concluded as a matter of law that an insurance company could not be liable for bad faith. For example, as noted by Justice Cantero in his dissent, in State Farm Fire CasualtyCo. v. Zebrowski, 706 So.2d 275, 277 (Fla. 1997), this Court concluded that the trial court's grant of summary judgment in favor of the insurer was proper because, under section 624.155, Florida Statutes (1995), the insurance carrier did not owe a duty to the third-party claimant in the absence of an excess judgment as a matter of law. However, Zebrowski is distinguishable because this case does not involve either the interpretation of section 624.155 or the absence of an excess judgment against the insured. It is undisputed that Infinity owed a duty to its insured, Berges, to act in good faith.
Moreover, where material issues of fact which would support a jury finding of bad faith remain in dispute, summary judgment is improper. See, e.g., Robinson v. State Farm Fire CasualtyCo., 583 So.2d 1063, 1069 (Fla. 5th DCA 1991) (reversing grant of summary judgment on bad faith claim where jury could find that *Page 681 
"a reasonably prudent person faced with paying the entire judgment" would have settled under disputed material facts). Butsee, e.g., Shuster v. S. Broward Hosp. Dist. Physicians' Prof'lLiab. Ins. Trust, 591 So.2d 174, 178 (Fla. 1992) (concluding that insurer could not be liable for bad faith as a matter of law where the policy provided that the insurer could settle any claim "as it deems expedient" and the insurer settled within policy limits). As noted above, this case was properly submitted to the jury to resolve disputed issues of material fact. Therefore, our review is limited to whether the verdict is supported by legally sufficient evidence. See Gutierrez, 386 So.2d at 785
(concluding that although the question of bad faith is generally for the jury, the verdict must be supported by legally sufficient evidence).
Infinity owed a duty to Berges to "investigate the facts, give fair consideration to a settlement offer that [was] not unreasonable under the facts, and settle, if possible, where a reasonably prudent person, faced with the prospect of paying the total recovery, would do so." Id. In this case, Infinity's independent investigation of the facts completed within a month after the accident revealed that this was a case of clear, if not aggravated, liability. At this time and three days before
Taylor delivered his demand for the policy limits, Infinity's investigator confirmed in writing to Infinity that the driver of its insured vehicle had, while intoxicated, crossed the center line and collided head-on with Taylor's wife's car. Not only was the driver of Infinity's insured vehicle determined to be one hundred percent at fault for the accident but as of that time, Infinity knew that Mrs. Taylor, a mother of two minor children, died as a result. Infinity also knew that one of Taylor's minor daughters sustained severe injuries, resulting in over $30,000 in medical bills to date. Thus, as of April 30, one month after the accident and several days before a demand was made, Infinity knew that this was a case of clear liability and substantial damages, and that a jury verdict could far exceed the insured's minimal policy limits of $20,000.
The actions of Infinity in the period following the receipt of the claim were properly considered by the jury in determining whether Infinity was acting with due regard for its insured's interests. The competent, substantial evidence to support the jury's finding consists of what the investigation revealed and Infinity's conduct after being presented with a written offer to settle for the policy limits.
As discussed more extensively above, the evidence construed in the light most favorable to Berges reveals that instead of doing everything reasonably possible to complete the settlement following the May 11 conversation, Fryer never contacted Taylor again or followed up with Korth to stress the urgency of the time limits. Fryer did not memorialize his understanding of the conversation with Taylor in a letter to him. When Korth communicated to Fryer that completing the settlement within the time demands was problematic, Fryer did not contact Taylor to request an extension, inform him that there was a problem with court approval, or otherwise investigate the possibility of placing the funds into interest-bearing accounts. Instead, the time limit in the May 2 written offer simply expired without any communication from Infinity to Taylor.
Lastly, although Infinity knew on April 30 that this was a case of clear liability with substantial damages, Infinity did not advise its insured, Berges, of the probable outcome of litigation that might be instituted, of the possibility of an excess judgment, or of the settlement negotiations between Taylor and Infinity until after Taylor had filed suit. After the May 11 conversation between Taylor and Fryer, Infinity failed to contact Berges until June *Page 682 
20, more than a month later and well after the settlement deadlines had expired.
When Infinity finally did contact Berges after Taylor had withdrawn his offer and filed suit, Infinity's description of the previous negotiations with Taylor was not accurate. In a letter that for the first time informed Berges about the possibility of an excess judgment and his right to retain independent counsel, Infinity told Berges in a postscript "that we have offered to pay your policy limits of $20,000 for the above claim, but Mr. Taylor refused to settle for that amount." The postscript did not mention the settlement deadlines and other terms of Taylor's May 2 settlement offer. If Infinity had advised Berges at the time the demand letter was received, Berges might have been able to obtain his own attorney who, recognizing that time was of the essence and that this was an offer that Berges could not afford to let expire, could have expedited any necessary court proceedings.
The totality of the circumstances regarding Infinity's failure to act in the best interests of its insured are similar to the circumstances in Hartford Accident Indemnity Co. v. Mathis,511 So.2d 601 (Fla. 4th DCA), review denied, 518 So.2d 1275
(Fla. 1987), in which the Fourth District stated:
 [I]t was clear to the carrier, from its own intra-departmental report, from the day after the accident (a) this was a horrendous injury including brain damage to a minor, (b) it was either an absolute or nearly absolute liability case, and (c) the policy limits were $25,000. Six weeks post-accident the victim's attorney orally requested policy limits . . . for a complete release of its insured. This information was not conveyed to the insured.
 No response was given for almost a month. . . . The victim's attorney then sent a written formal demand for the limits and extended only ten days within which the carrier could tender $25,000. Although this court has indicted its unhappiness with "ten day demand" letters, under these facts we find no error justifying reversal since there was sufficient evidence from which the jury could have found a breach of the carrier's duty of good faith. . . .
 In addition, there was evidence of the carrier's failure to communicate appropriately with its insured as well as a lack of candor and complete integrity in that which it did communicate, all of which could also justify the jury's finding of bad faith.
Id. at 602 (citation omitted). We conclude that the Fourth District's analysis in Hartford is equally applicable to this case.
The facts of this case recounted above support the conclusion that, in the words of the trial judge, Infinity entirely "dropped the ball" in its handling of this case. Under the totality of the circumstances standard employed in Florida, we conclude that based on these facts, there was competent, substantial evidence to support the jury verdict that Infinity breached its duty of good faith to Berges.
 CONCLUSION
In our decision today, we have not attempted to alter bad faith jurisprudence, nor has any party requested that we do so. This Court articulated the law of bad faith more than two decades ago in Gutierrez, which itself relied on case law from this Court dating back to 1938. Bad faith law was designed to protect insureds who have paid their premiums and who have fulfilled their contractual obligations by cooperating fully with the insurer in the resolution of claims. The insurance contract requires that the insured surrender to the insurance company control over whether the claim is settled. In exchange *Page 683 
for this relinquishment of control over settlement and the conduct of the litigation, the insurer obligates itself to act in good faith in the investigation, handling, and settling of claims brought against the insured. Indeed, this is what the insured expects when paying premiums. Bad faith jurisprudence merely holds insurers accountable for failing to fulfill their obligations, and our decision does not change this basic premise.
Justice Wells expresses concern in his dissent over the future economic effect that our decision will have on Florida's liability insurance consumers. In his dissent, Justice Wells has not cited any empirical data showing that since our decision inGutierrez there has been a direct correlation between bad faith claims and increased premiums. To the contrary, it is far more likely that the insurer's knowledge of the potential consequences of placing its own interests over that of its insured has a beneficial effect on the handling of claims.
Justice Wells also posits in his dissent that our decision and reaffirmation of bad faith law provides the insured more coverage than that which he initially bargained for. However, as was recognized by this Court as early as 1938, "[i]t is well settled in cases of limited liability insurance that the insurer may so conduct itself as to be liable for the entire judgment recovered against the insured, although that judgment exceeds the amount of liability named in the policy." Shaw, 184 So. at 858 (quotingAm. Mut. Liab. Ins. Co. v. Cooper, 61 F.2d 446, 447 (5th Cir. 1932)).
In sum, our decision today does not carve out any novel jurisprudence regarding bad faith claims. Rather, our decision reaffirms that an insurer owes a duty of good faith to its insured. Moreover, the basis of our decision is our agreement with the approach adopted by the First District in Grounds that court approval is not a prerequisite to a valid settlement offer.
For the reasons stated above, we approve Grounds and quash the Second District's decision in Berges to the extent that it is inconsistent with this opinion. On remand the judgment of the trial court should be reinstated.
It is so ordered.
ANSTEAD, LEWIS, and QUINCE, JJ., concur.
ANSTEAD, J., concurs with an opinion.
WELLS, J., dissents with an opinion, in which CANTERO and BELL, JJ., concur.
CANTERO, J., dissents with an opinion, in which WELLS and BELL, JJ., concur.
[1] In one claim, Berges asserted that Infinity acted in bad faith in failing to accept Taylor's "Cunningham" proposal that the parties try the bad faith case before litigating the underlying tort claim. See Cunningham v. Standard Guar. Ins.Co., 630 So.2d 179 (Fla. 1994). The trial court granted summary judgment in favor of Infinity on this claim. Although Berges claims that the trial court erred in granting summary judgment on this claim, we reject this issue as being without merit.
[2] The final judgment represents the amount of the excess judgment plus accrued interest.
[3] This statute has been amended since 1990 to require court approval of any claim in excess of $15,000. See § 744.387(2), Fla. Stat. (2002).
[4] Section 733.601 provides:
 The powers of a personal representative relate back in time to give acts by the person appointed, occurring before appointment and beneficial to the estate, the same effect as those occurring thereafter.
[5] We directly address this alternative in order to determine whether we can affirm on grounds other than those relied on by the district court. See Dade County School Bd. v. Radio StationWQBA, 731 So.2d 638, 645 (Fla. 1999). We have stated that "in some circumstances, even though a trial court's ruling is based on improper reasoning, the ruling will be upheld if there is any theory or principle of law in the record which would support the ruling. This longstanding principle of appellate law, . . . referred to as the `tipsy coachman' doctrine, allows an appellate court to affirm a trial court that reaches the right result, but for the wrong reasons so long as there is any basis which would support the judgment in the record." Robertson v.State, 829 So.2d 901, 906 (Fla. 2002) (internal quotation marks and citation omitted).
[6] Fryer testified that when Korth informed him during the May 23 telephone conversation that there might be some problems with getting the court approvals by the deadlines, Fryer did not
respond by informing Korth not to worry because the May 11 "settlement" did not have a time demand.
[7] The cases cited by Justice Cantero in his dissent do not support a different principle of law. For example, in SouthernGeneral Insurance Co. v. Holt, 262 Ga. 267, 416 S.E.2d 274, 276
(1992), the Georgia Supreme Court affirmed a jury verdict against an insurer for bad faith failure to settle within the policy limits. The court noted that the issue was whether under all the facts the jury could determine that the insurer acted unreasonably in declining to accept a time-limited offer. The Fifth District Court of Appeal's decision in Clauss v. FortuneInsurance Co., 523 So.2d 1177, 1179 (Fla. 5th DCA 1988), is distinguishable both because it interprets section 624.155, Florida Statutes (1985), which relates to statutory bad faith causes of action, and because, in that case, the insurance company was still investigating and verifying its liability during the time period, and tendered the policy limits only one day after the notice of bad faith was sent.
[8] As of May 14, 1990, an order had been entered appointing Taylor as personal representative. The probate court required Taylor to post a bond before it would issue letters of administration. However, it is undisputed that Taylor had the authority to make the policy limits demand on behalf of the estate and the survivors, which consisted of Taylor as surviving spouse and the minor children.
[9] Justice Cantero asserts in his dissent that the failure to complete the settlement was due to Taylor unilaterally revoking his offer on June 11. See dissenting op. at 691 (Cantero, J., dissenting). This position ignores the explicit terms of Taylor's May 2 demand letter, which gave Infinity until May 27 to pay the wrongful death claim and June 1 to pay the minor's claim. As noted above, from Taylor's point of view the terms of that demand remained in effect. When Infinity did not perform within the deadlines, the demand expired. Moreover, Justice Cantero's dissent ignores the evidence that suggests that the failure to consummate the settlement was due to Infinity's own actions in not communicating with Taylor, not working diligently to obtain the court approvals, and not tendering the funds into interest-bearing accounts within the deadline. This issue was properly submitted to the jury.
[10] In reaching its conclusion, the Second District relied on two cases: A.W. Huss Co. v. Continental Casualty Co.,735 F.2d 246 (7th Cir. 1984) and Shuster v. South Broward HospitalDistrict Physicians' Professional Liability Insurance Trust,591 So.2d 174 (Fla. 1992). Neither of the cases supports the Second District's broad holding that an insurer does not have a duty to involve its insured in discussions for settlement within the policy limits. Further, A.W. Huss Co. and Shuster are factually distinguishable from this case because neither case concerned a situation in which the insurer was offered a settlement within the policy limits but did not settle. Rather, in both A.W. Huss Co. and Shuster, the insurers actually settled within the policy limits and the insureds were not subjected to excess judgments. See A.W. Huss, 735 F.2d at 247;Shuster, 591 So.2d at 175.