[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-10113

_____

D.C. Docket No. 3:14-cv-00397-BJD-JRK


ETHEL COUSIN,

                                                        Plaintiff - Appellant,

versus

GEICO GENERAL INSURANCE COMPANY,
a foreign corporation,

                                                        Defendant - Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(January 16, 2018)

Before MARCUS, MARTIN, and NEWSOM, Circuit Judges.

PER CURIAM:

    Plaintiff-appellant Ethel Cousin brought this first-party bad faith action

under Fla. Stat. § 624.155 alleging that her insurer, GEICO General Insurance Company ("GEICO"), acted in bad faith in handling her claim for underinsured motorist coverage following a car accident in which she sustained serious injuries. The district court granted summary judgment in favor of GEICO, concluding that Cousin's attorney's actions following the accident impeded GEICO's ability to fulfill its duty of good faith. Although we agree with the district court that, as a matter of Florida law, the conduct of an insured—or her lawyer—may be relevant to determining whether an insurer acted in bad faith, we disagree that summary judgment was proper on this record. Instead, we hold that genuine issues of material fact exist concerning whether, under all the circumstances here, GEICO acted in bad faith. Accordingly, we vacate the district court's order granting summary judgment and remand for further proceedings.

## I

### A

We begin with a brief primer on Florida first-party bad faith law, which will set the stage for much of what follows. In Florida, a first-party bad faith claim arises when an insured sues her own insurer alleging an improper denial of benefits. This cause of action is distinct from the underlying claim for uninsured—or, as in this case, *under*insured—motorist ("UM") benefits and allows the insured to recover damages in excess of the UM policy limits.

2

Until 1982, Florida recognized only a common law third-party bad faith action, which permitted an injured third party to recover from an insured's insurer the full extent of the damages if the insurer breached its duty of good faith in handling the third party's claim. *See Fridman v. Safeco Ins. Co. of Illinois*, 185 So. 3d 1214, 1220 (Fla. 2016). In 1982, the Florida Legislature created a statutory first-party bad faith cause of action through the enactment of Fla. Stat. § 624.155, thereby extending the insurer's duty to act in good faith to claims brought by its own insured under a UM policy. *Id.* Specifically, Section 624.155 gives an insured a right of action against her insurer for "[n]ot attempting in good faith to settle claims when, under all the circumstances, it could and should have done so, had it acted fairly and honestly toward its insured and with due regard for her or his interests." Fla. Stat. § 624.155(1)(b)(1).

As a condition precedent to bringing an action under Section 624.155, the insurer must be given 60 days written notice of the alleged violation by way of a Civil Remedy Notice of Insurer Violations ("CRN"). Fla. Stat. § 624.155(3)(a). "This sixty-day window provides insurers with a final opportunity 'to comply with their claim-handling obligations when a good-faith decision by the insurer would indicate that contractual benefits are owed.'" *Fridman*, 185 So. 3d at 1220 (quoting *Talat Enterprises, Inc. v. Aetna Cas. & Sur. Co.*, 753 So. 2d 1278, 1284 (Fla. 2000)). If, within 60 days after the CRN is filed, the damages are paid or the

3

alleged violation is otherwise corrected, then "[n]o action shall lie."  Fla. Stat. § 624.155(3)(d).

In Florida, courts apply a totality-of-the-circumstances test to determine whether an insurer has acted in bad faith in handling claims brought by its insured. *Berges v. Infinity Ins. Co.*, 896 So. 2d 665, 680 (Fla. 2004).  Application of this standard requires the factfinder to consider the insurer's entire course of conduct based on the particular facts of each case, including "efforts or measures taken by the insurer to resolve the coverage dispute promptly," "the substance of the coverage dispute or the weight of legal authority on the coverage issue," and "the insurer's diligence and thoroughness in investigating the facts specifically pertinent to coverage."  *State Farm Mut. Auto. Ins. Co. v. Laforet*, 658 So. 2d 55, 63 (Fla. 1995).  To demonstrate good faith, an insurer "must investigate the facts, give fair consideration to a settlement offer that is not unreasonable under the facts, and settle, if possible, where a reasonably prudent person, faced with the prospect of paying the total recovery, would do so."  *Berges*, 896 So. 2d at 672 (internal quotation marks omitted).

**B**

Cousin's bad faith claim arises from a June 12, 2009 car accident in which she and her husband both sustained serious injuries after another vehicle struck their car at an intersection.  The accident report attributed fault to the driver of the

4

other vehicle—Helen Bratcher—who is not a party to this lawsuit.  The same day, Cousin reported the accident to GEICO, who also insured Bratcher, claiming injuries to her leg, knee, neck, and shoulder.  Soon after the accident, Cousin retained counsel to represent her in her efforts to recover for her accident-related injuries.

On July 28, 2009, Cousin's lawyer sent a letter to GEICO regarding Cousin's bodily injury ("BI") claim demanding the $10,000 BI policy limit under Bratcher's policy.  Attached to the BI demand letter were medical records showing that Cousin had sustained a displaced spiral fracture to her right tibia and x-ray records showing scoliosis of the thoracic spine and mild degenerative disc disease. On August 3, GEICO tendered Bratcher's BI policy limit of $10,000 to Cousin due to her leg fracture.

On August 10, Cousin's attorney notified the GEICO claims adjuster assigned to Cousin's UM case—Kimberly Stephens—that Cousin had received $10,000 for her BI claim against Bratcher, but that Bratcher was underinsured with respect to BI liability coverage.  He therefore demanded payment of the full $100,000 available under Cousin's UM policy.  He attached a copy of the July 28 demand package that had been submitted in conjunction with Cousin's BI claim.

Simultaneously with the August 10 UM demand, Cousin's lawyer also filed the first of two CRNs asserting that GEICO had acted in bad faith—in particular,

5

by failing to offer anything in settlement of Cousin's UM claim despite her serious injuries.  GEICO responded on August 17 to confirm receipt of the demand and to inform Cousin that she would be contacted following evaluation of her claim.

On August 19, Cousin's lawyer submitted additional medical records—some of which, however, predated the accident.  The records revealed, for instance, that Cousin had testing on her lumbar in February 2007—more than two years before her wreck—that showed mild broad lumbar dextroscoliosis.  The records also showed that Cousin underwent additional testing on her lumbar following the accident; those tests revealed degenerative disc and joint disease, but no acute findings.

On August 26, GEICO completed its review of Cousin's UM claim.  GEICO determined that the information available to it at the time was "[l]imited" and that it would need personal injury protection ("PIP") logs[1] and billing information in order to properly evaluate the claim.  The following day, GEICO's Stephens requested these documents from Cousin, along with any documentation of lost wages.  On September 9, Stephens again advised Cousin that her claim remained under consideration and that GEICO would need PIP logs, lost-wage information, and all medical records and bills related to the accident in order to proceed.  On

---

[1] A PIP log chronicles payments under an insurance policy's PIP coverage, which usually pays for reasonable medical expenses resulting from injuries to a driver or passenger arising from a collision involving an insured vehicle.

September 29, GEICO again requested Cousin's medical records and bills by letter and during a phone conversation with Cousin's lawyer, who reported that Cousin was still undergoing treatment and that he would update GEICO regarding her status in a week or so.

In a letter dated October 5, Cousin's lawyer provided GEICO the promised update. In particular, he noted that her fractured tibia had received a positive prognosis and was healing well, but that she was still experiencing "tremendous" back pain for which she had already received two epidural injections and was expected to receive a third the following week. The letter also informed GEICO that Cousin had met informally with her husband's neurosurgeon, Dr. Gomes, at one of her husband's appointments, and that as a courtesy, Dr. Gomes had reviewed her MRI films and requested that she schedule an appointment to explore a lumbar fusion procedure, for which, he said, she might be a candidate given that the epidural injections were not relieving her pain. Cousin's lawyer's letter attached a report from an August 10, 2009 MRI of Cousin's lumbar, which showed a mild annular disc bulge, eccentric disc bulge, mild central canal stenosis, and small central disc protrusion. The letter, however, did not include any notes from Dr. Gomes to support the opinions that the letter attributed to him. Nor did Cousin's attorney provide the PIP logs or lost wage information that GEICO had requested.

7

On October 7, Cousin provided GEICO with a letter confirming that she had scheduled an October 29 appointment with Dr. Gomes.

On October 8—the end of the first 60-day CRN cure period—GEICO responded that it had received the additional medical records attached to the October 5 letter, but noted that Cousin had provided only one medical bill, no PIP logs, no recommendation for surgery, and no lost-wage documentation. Based on the lack of quantifiable damages and the $10,000 BI benefits already paid, GEICO offered $5,135.00 to resolve Cousin's UM claim. GEICO also requested MRI films of Cousin's lumbar so that it could conduct an independent medical evaluation ("IME"), per its rights under Cousin's policy.

On October 12, Cousin provided medical bills of $11,882 and evidence of lost wages totaling approximately $2,000. The same day, Cousin's lawyer filed a second CRN, asserting that GEICO had again acted in bad faith, this time by failing to make a timely, reasonable offer to settle her UM claim "despite being presented with documentation supporting a very serious set of injuries," and that as a result, Cousin had suffered "undue additional financial loss and additional pain and suffering and emotional distress."

On October 21, GEICO scheduled an IME for Cousin on November 2. On October 30, Cousin's counsel contacted GEICO to reschedule the IME because, he said, it was never cleared on his schedule. He offered to reschedule Cousin's exam

8

on a date that was convenient for both parties and attached a copy of the requested PIP logs showing that Cousin had received an additional $10,000 from GEICO under her PIP coverage.

On November 5, GEICO and Cousin rescheduled the IME for November 9. The next day, November 6, Cousin's lawyer contacted GEICO to inform it that on November 4, Dr. Gomes had performed a percutaneous endoscopic laser discectomy and arthroscopic laser facet ablation on Cousin, and that, as a result, her IME would again need to be canceled because she was "not medically able to undergo an IME for at least another 3 weeks." Along with the notice of cancelation, Cousin's attorney attached a surgeon's bill for $27,340 and a pre-operative exam bill for $375, and informed GEICO that Cousin's total out-of-pocket expenses were estimated to be approximately $60,000. The letter also indicated that Cousin had filed a state court lawsuit the same day and threatened to perfect service of process on GEICO if Cousin did not receive the full $100,000 policy limits by November 11.

On November 11, GEICO sent a fax to Cousin outlining its previous efforts to resolve her UM claim, including its repeated attempts to gather the necessary documentation and schedule an IME, and stating its belief that the cost of the surgery with Dr. Gomes was "excessive and not reasonable" and would be reviewed for proper coding and pricing. GEICO's letter concluded with an

9

increased settlement offer of $14,104.

Cousin's trial counsel responded on November 12 with a letter expressing his confidence that a jury would agree that GEICO's "offer *utterly fails* in every respect" and that "[u]nfortunately, [they would] have to move forward in litigation and let a jury decide what Ms. Cousin is entitled to receive in compensation for her injuries." The letter included the first hard evidence linking the car accident to a permanent injury—a report from Dr. Gomes stating his belief that Cousin sustained a permanent lumbar injury as a result of her accident. Cousin's lawyer reemphasized his belief that Cousin should be entitled to the full amount available under her UM policy and extended the deadline for GEICO to tender the UM policy limits to November 12 at 2:00 p.m. He warned GEICO that "all offers to settle this case within [the] policy limits will be *withdrawn*" after the deadline.

On December 11—the end of the second 60-day cure period—GEICO sent a letter to Cousin stating that the parties had a "difference in opinion as to the value of this case" and because a lawsuit had already been filed, the case would be handled by GEICO's staff counsel attorney's office.

<h3 style="text-align:center">C</h3>

Cousin's state-court bad faith action was tried in Duval County, Florida in October 2011. The jury rendered a verdict in Cousin's favor and against GEICO in the amount of $1,305,000, which the state court reduced to the UM policy limits of

$100,000.

In an attempt to collect the balance of the award, Cousin filed this lawsuit in the United States District Court for the Middle District of Florida, alleging (again) that GEICO acted in bad faith in handling her UM claim.

The district court granted summary judgment in favor of GEICO.  In so doing, the court emphasized that Cousin's lawyer's "perpetual delay in providing GEICO necessary information to make an informed offer" frustrated GEICO's attempts to conduct a meaningful evaluation of her claim before the deadline.  In reaching this conclusion, the district court focused on the following: (1) that Cousin's attorney filed his first CRN asserting that GEICO had acted in bad faith in handling her UM claim on the same day that he filed the initial UM demand, thereby depriving GEICO of any opportunity to respond; (2) that Cousin's lawyer thwarted GEICO's efforts to conduct a meaningful independent review of her UM claim by failing to timely provide medical records and medical bills, and by repeatedly canceling and refusing to submit to an IME prior to his threatened deadline for serving the lawsuit; (3) that Cousin's medical records revealed that she had previously undergone tests on her lumbar before the accident and that the original reports following the accident mentioned nothing about a lumbar injury or recommendation for surgery; (4) that Cousin's complaint was focused on information contained in the medical records from Dr. Gomes, which her lawyer

11

did not provide to GEICO until November 6, 2009—the same day he filed a state-court lawsuit and only five days before his threatened deadline for serving the lawsuit on GEICO; and (5) that Cousin's attorney failed to offer evidence of a permanent injury until November 12, 2009—the day *after* his original deadline for serving the lawsuit.

Cousin timely appealed to this Court.

## II

On appeal, Cousin—now represented by new counsel—presents one legal challenge and one factual challenge to the district court's order. As to the former, Cousin argues that in assessing GEICO's bad faith, the district court improperly focused on the actions of Cousin's lawyer rather than GEICO's own conduct. As to the latter, Cousin contends that one or more of six disputed factual issues preclude summary judgment at this stage of the proceedings. We consider Cousin's arguments in turn.[2]

## A

Cousin initially contends that in handling her bad faith claim, the district court erred as a matter of Florida law by "focusing entirely" on the actions of

---

[2] "We review a district court's grant of summary judgment *de novo*, applying the same legal standard as the district court and construing the facts and drawing all reasonable inferences therefrom in the light most favorable to the non-moving party. We will affirm a grant of summary judgment if the movant has shown, based on our review of the entire record, that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Mississippi Valley Title Ins. Co. v. Thompson*, 802 F.3d 1248, 1252 (11th Cir. 2015) (internal citations omitted).

Cousin and her attorney rather than on GEICO's own conduct.

To be sure, in Florida, "the focus in a bad faith case is not on the actions of the claimant but rather on those of the insurer in fulfilling its obligations to the insured." *Berges*, 896 So. 2d at 677. Just as surely, though, "that does not mean that all inquiries into prior conduct and motives are irrelevant and prejudicial." *Barry v. GEICO Gen. Ins. Co.*, 938 So. 2d 613, 618 (Fla. Dist. Ct. App. 2006). Although a bad-faith claim derives from and emphasizes the duty of the insurer to the insured, the conduct of a claimant and the claimant's attorney are relevant to determining the "realistic possibility of settlement within the policy limits." *Id.*

The district court here did not run afoul of Florida law by considering whether Cousin's lawyer had thwarted GEICO's efforts to conduct a meaningful independent review of her UM claim—for instance, by filing the first CRN asserting that GEICO had handled Cousin's UM claim in bad faith on the same day that he communicated Cousin's initial UM demand, and by providing the first hard evidence of a permanent injury as a result of the accident on November 12, 2009—the day after his original threatened deadline for serving the lawsuit. While Cousin is correct that under Florida law the focus of a bad faith claim is on the conduct of the insurer, the insured's—or, as here, the insured's lawyer's—actions are part of the "totality of the circumstances," especially to the extent that they impede the insurer's good faith duty to investigate facts and give fair consideration

13

to settlement.  *Berges*, 896 So. 2d at 677; *Barry*, 938 So. 2d at 618.

Accordingly, Cousin's legal argument provides no basis for reversal.

**B**

Cousin separately contends that the following are disputed facts based on which a reasonable jury could conclude that GEICO acted in bad faith: (1) whether GEICO's settlement offers were inadequate; (2) whether GEICO failed to adequately evaluate her back injury and surgical procedure; (3) whether GEICO failed to consider the permanency of her injury; (4) whether the reasons GEICO provided for delaying and denying her claim were pretextual; (5) whether GEICO handled the scheduling of her medical exam in bad faith; and (6) whether her proffered expert testimony demonstrated that GEICO acted in bad faith.

It is true, as GEICO says, that Florida courts have at times resolved bad faith claims as a matter of law where undisputed facts would allow no reasonable jury to conclude that the insurer acted in bad faith.  However, it remains the general rule that the issue of bad faith is a question for the jury.  *Noonan v. Vermont Mut. Ins. Co.*, 761 F. Supp. 2d 1330, 1335 (M.D. Fla. 2010); *Berges*, 896 So. 2d at 680.

Here, we must agree that genuine issues of material fact remain in dispute and, accordingly, that summary judgment was improper.  For instance, in response to Cousin's $27,340 percutaneous-discectomy surgery bill and the $375 pre-operative bill, GEICO's Stephens stated that these amounts were "excessive and

14

not reasonable" and that GEICO would perform its own evaluation of proper coding and pricing for the procedure. Stephens later testified, however, that a typical billing range for this procedure was between $20,000 and $75,000, and admitted that the total amount estimated for Cousin's procedure was within that range. Accordingly, at the very least, a dispute remains as to the reasonableness of the billing for Cousin's percutaneous discectomy, and therefore, the adequacy of GEICO's second settlement offer. Under Florida's totality of the circumstances approach, the reasonableness and adequacy of an insurer's settlement offer are relevant factors to consider when determining bad faith, and as such, constitute genuine issues of material fact that preclude summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); Fed. R. Civ. P. 56(a).

In light of our conclusion that summary judgment was improperly granted, we need not address Cousin's remaining factual arguments. We think it more prudent to leave consideration of those issues for remand.

## III

For the foregoing reasons, we hold that genuine issues of material fact remain in dispute and that the district court erred by granting summary judgment. Accordingly, we vacate the district court's order and remand for further proceedings consistent with this opinion.

**VACATED** and **REMANDED**.

15