Gregory Charles WELFORD, as the Personal Representative of the Estate of Rachel Lynn Welford, Plaintiff,

v.

LIBERTY INSURANCE CORPORATION, Defendant.

Case No.: 3:15–cv–333/RV–CJK

United States District Court, N.D. Florida, Pensacola Division.

Signed June 2, 2016

Charles Thomas Wiggins, James Nixon Daniel, Beggs & Lane RLLP, Pensacola, FL, for Plaintiff.

David B. Krouk, Matthew John Lavisky, Butler Weihmuller Katz etc LLP, Tampa, FL, for Defendant.

## ORDER

ROGER VINSON, Senior United States District Judge

This third-party bad faith case arises out of a fatal car accident in 2009. It is a so-called *"Powell* case," based on a theory of liability in Florida recognized in *Powell v. Prudential Prop. & Cas. Ins. Co.,* 584 So.2d 12 (Fla.3d DCA 1991). Discovery is closed, and the defendant now moves for summary judgment (doc. 45). The plaintiff has opposed the motion, and the defendant has filed a reply in further support.

### I. Background

Except where otherwise noted, the following facts are undisputed in the record.

At the time relevant to this case, the defendant, Liberty Insurance Corporation ("Liberty"), insured Lisa Mottsey under an automobile insurance policy. The policy provided for bodily injury liability of $10,000 per person and $20,000 per accident, and it listed a 1992 Mercury Sable as a "covered vehicle." The Sable was owned and being used by Mottsey's daughter, Cassie Mayhair.

On the evening of February 26, 2009, Mayhair and her then-boyfriend, John Christopher Middleton, were in the vehicle and traveling north on County Road 95-A, a dark and rural two-lane road about 15 miles north of Pensacola, Florida. Middleton was driving with Mayhair's consent, and there is no evidence in the record that he was speeding or otherwise operating the vehicle in an unsafe manner at that point in time. In fact, it appears that he was driving below the posted speed limit of 45 mph.

At or around 10:00 p.m., a vehicle being driven by Matthew Zisa (also traveling north on County Road 95-A) approached the Sable from the rear and tried to pass in the southbound lane in a "marked passing zone." Middleton sped up, after which Zisa returned to the northbound lane and Middleton slowed back down.[1] Shortly thereafter, Zisa got back in the southbound lane and tried to pass the Sable a second time. At that moment, there were three pedestrians walking north in the southbound lane: Rachel Welford (17 years old) ("Rachel"); Jeremy Shipley (24 years old); and Jonathan Kane (21 years old). They were walking side-by-side near the middle of the road; they were wearing dark clothes; they had no flashlights; and one of them (Shipley) was listening to an MP3 player. Zisa's vehicle hit all three of them at full speed, killing Welford and Shipley and injuring Kane. The Sable did not hit or make any contact with Zisa's car or with the pedestrians. The record reflects that Middleton and Mayhair did not

---

1. Middleton reportedly told the investigating officer that he tried to keep Zisa from passing after he (Zisa) had flashed his headlights at him and because Zisa "didn't need to be speeding" (doc. 49-2, Ex. 5, at 17).

even know at first that anyone had been hit. They claimed that they heard "a loud bang," saw Zisa's headlights go dark, and initially thought he might have hit a tree or pole. After the crash, Middleton and Mayhair drove home, called 911, and then returned to the scene, where they gave statements to law enforcement.

The investigating officer, Corporal Brian Davis of the Florida Highway Patrol ("FHP"), concluded in his report that the pedestrians were responsible for the accident as they violated Florida Statute § 316.130 (which provides, *inter alia*, that a pedestrian walking along a road must walk on the shoulder on the left side of the road in relation to his direction of travel, facing traffic that may approach from the opposite direction). In finding that Zisa was not at fault, Corporal Davis's report stated:

> It is this officer's conclusion that [Zisa] was attempting to lawfully pass in a marked passing zone and was using prudent care as he attempted to pass the vehicle. Due to the time of night, dark roadway, and the dark colored clothing that [Rachel, Shipley, and Kane] were wearing at the time of the fatal crash, [Zisa] had no reaction time to attempt to avoid the hazard of the pedestrians walking in the southbound lane prior to the collision. [Zisa] was still driving at a reasonable speed as he attempted to pass based on the standard industry formulas used to calculate [his] minimum speed[.]

Because Zisa was traveling at a "reasonable speed" and toxicology results showed that he was not under the influence of

narcotics or alcohol, he was not issued any citation. The accident report concluded that "no charges will be filled [*sic*] because the at-fault parties expired as a result of the crash."[2]

On or about March 4, 2009, Rachel's uncle contacted the Levin Papantonio law firm in Pensacola "to discuss what steps [the family] should be taking." Rickey Cook, an investigator with that firm, was asked to investigate a possible claim for Rachel.[3] During his investigation, Cook identified three potential parties who might have been at fault for the accident: the pedestrians for walking in the middle of the dark road; Zisa for passing in the southbound lane; and Middleton for initially speeding up and not letting Zisa pass. However, Cook testified during his deposition that by March 23, 2009, "it wasn't clear" if they had a liability claim against Middleton.

The next month, on April 23, 2009, Cook asked attorney Fredric Levin if the firm should "step out" of the case because, *inter alia*, "at this time, we [still have] no concrete evidence or liability against Middleton." Levin responded by directing Cook to investigate further. Cook then spoke with Corporal Davis, and the officer told Cook that "Middleton is listed as a witness. There [was] no contact with his vehicle. FHP can't prove that he contributed to the accident." On or about May 1, 2009, Cook sent an email to attorney Levin asking if he (Levin) thought there was "enough evidence" to make a claim against Middleton. Cook wrote at the time: "[Corporal Davis] ... is placing blame on the

---

2. At no point in the exhaustive (21-page) accident report is it even suggested that Middleton was responsible for the crash (doc. 49-2, Ex. 5). It appears to have been presumed at the time that he was not.

3. As will be seen *infra*, the survivors of the other deceased pedestrian (Shipley) did not file a claim and are not at issue here. The injured pedestrian (Kane)—who was also represented by the Levin firm—filed a claim and later settled with Liberty for $10,000, so he is not at issue either.

kids because our client and the other deceased kid were walking near the center line, it was dark, no ambient light, and wearing dark clothing. How do you wish to proceed?" Levin believed that "we have enough to bring Middleton into the case" and directed Cook to further investigate insurance coverage.

On May 7, 2009, Cook called and spoke to Lisa Mottsey. She was very angry and insisted that Middleton and Mayhair had done "nothing wrong." She also refused to give the name of her insurance company and denied that she had liability coverage on the Sable, which was not true.[4] According to Cook, if Mottsey had told him that she had liability coverage (or even the name of her insurer), he would have contacted the insurer to discuss the matter. However, in light of what she said, it was assumed that she did not have any liability coverage. Based on that assumption—and because Mottsey, Middleton, and Mayhair had very few assets—the Levin firm "stepped out" of the case and referred the Welford family to another attorney, Robert Kerrigan.

Shortly after Cook called Mottsey on May 7, 2007 (in fact, later that same day), she called Liberty. That was the first contact with Liberty by anyone connected to this case, and it was the first time that Liberty learned of the accident that had occurred more than two months prior. This entire bad faith claim hinges on the May 7th call.[5]

Mottsey was deposed in May 2010 (in connection with the underlying wrongful death case), and she testified as follows about her May 7th call to Liberty:

Q: Did you have communication with any representative of Liberty Mutual after the events here, the accident occurred?

A: I called them when I got a call from an investigator who found my cell phone number when he called me at work and left me a nasty message. He was an investigator, and I was really irate.

I said, why don't you leave them alone. She's horrified. She has nightmares over this. I said—you know, I kind of really grilled him. I was really frustrated. I was going through a hard time. I wasn't getting my child support. I said, nobody can find my ex-husband, but yet, you can find out my new last name and my cell phone number and call me and harass me wanting my insurance information, and I will not give it to you. Yes, I have insurance, but I refused to give it to him at the time.

After that I called Liberty Mutual because I was upset, and I asked them, you know, is there anything that can happen. I said, my daughter was a witness in an accident. I said, I don't understand how a witness to an accident that gives a statement, you know, can be under investigation.

---

4. According to Cook, Mottsey expressly told him that she did not have any liability insurance (doc. 53 at 62-63), but she has denied that she specifically said that (doc. 58 at 14). It is undisputed, however, that Mottsey told Cook that she only had the minimum insurance required for the car (i.e., "the basic limits ... to keep a tag and be legal") (doc. 58 at 16-17), which in Florida (surprisingly) is only Personal Injury Protection ("PIP") coverage under Florida's "no fault" law [see Fla. Stat. §§ 627.730-627.7405], and property damage coverage under Fla. Stat. § 324.022.

5. There is a dispute in the record as to whether there was one or two calls between Mottsey and Liberty that day. The plaintiff relies on a phone record of a return call from Liberty to Mottsey. However, the number of calls does not matter; what matters is what was said. As will be discussed in the text, there is no *material* dispute in the record as to the content of the call(s).

And I said, well, I didn't give them any information, but, you know, I won't give the information. They told me they would flag my account in case something came up, that they would give me a call[.]

\* \* \*

Q: Do you remember when you called Liberty Mutual, what you told them about the accident, what you know about the accident?

A: I just told them that they were on their way home from work and that there was a car that was speeding up behind them, and they tried to get them off their tail, and the car shot out around them, and later on we found out that there was injuries and fatalities · involved, but they weren't the ones particularly involved, they were more of a witness to the case, and that was just about all I knew.

Mottsey was deposed a second time in December 2015 (in connection with this bad faith case), and she similarly testified:

Q: And what prompted you to call Liberty Mutual in May of 2009?

A: I had received a voice mail from an investigator in the case of Welford and myself, I guess. I didn't know anything about a lawsuit. And the investigator, I called him as soon as I went to lunch that day, ... and he rattled my nerves. He was wanting all my insurance information, wanting me to give him my policy number and I had no clue what was going on. And just coming out of a bad divorce and not receiving child support, it just angered me because my child support every time he took a job and they started taking his money, he would quit that job. And I said, well, if you can find me and get my phone number, why can't anybody do anything about my child support? And I kind of got rattled.

So I went to the car and I got out my insurance card because I keep it in my visor, I have a little pouch that I keep the registration, and got the phone number, the 800 number off my insurance card and called.

And, of course, you get the first representative and the lady I talked to, I tried to explain to her the situation about the car wreck that they weren't involved in because the vehicle had not crashed into anybody; and she was telling me that she wasn't sure but that she didn't think that there was anything that they could do. She says, let me put you on hold and I'll get my supervisor. And she got her supervisor on the phone and I explained everything again about the investigator calling me, you know, saying that there was the accident, we were involved in it, we were considered to be involved in it under the Florida law. And the insurance company was telling me—the other man said, well, absolutely, if your car had not—your daughter's car had not been directly involved in the accident and if there was no charges or tickets given in the case, ·that we were not involved and not to worry about it.

\* \* \*

Q: All right. Did you tell them that Cassie was a witness to the accident?

A: Yeah, I think so.

Q: Okay. Do you remember using that word "witness"?

A: I believe they were a witness in a way because of the way the vehicle shot off around and they thought that they hit a tree.

Q: Okay. And I think you testified that you told them that the vehicle, Cassie's vehicle was not involved in the crash?

A: Right[.]

Customer Service Specialist Christopher Henry was one of the people at Liberty

that Mottsey spoke to on May 7th. He does not remember the call, but he made a note in Liberty's customer service database. This is the only record of the call, and it reads: "Ms ph cld to verify liab limits & xfer to claims. Ph disconnected during xfer." Henry has explained that this note means that Mottsey called to verify her policy limits and was transferred to claims, during which the phone call was dropped. Mottsey testified at deposition that she did not call to verify her limits, she did not ask to be transferred to claims (although she conceded that the representative may have tried to transfer her to claims unbeknownst to her), and the call was not disconnected. To the extent these facts are disputed, they are not relevant to the issues on summary judgment. What is relevant (and undisputed) is that Mottsey reported to Liberty that the insured vehicle was not involved in an accident, but that an investigator had contacted her about her daughter and the driver—possible witnesses—and Liberty took no action in response to that call.

Several months later, on August 21, 2009, Kerrigan filed a wrongful death case in Florida state court on behalf of Gregory Charles Welford, as personal representative of his daughter Rachel's estate ("Welford"). The complaint named Mottsey, Mayhair, Middleton, and Zisa as defendants, and they were served on October 3, 2009. Between May 7, 2009 (the day that Mottsey called Liberty), and October 3, 2009 (the day that defendants were served), no one on either side communicated with Liberty about the accident. Mottsey never followed-up after the May 7th call, and Welford and Kerrigan did not make a pre-suit demand or offer of settlement, file a claim, or otherwise try to contact Liberty to discuss the accident. It appears that Welford and Kerrigan did not make any such efforts because, based on what Mottsey had told Cook (which was then passed along to Levin and, later, to Kerrigan), Welford and his attorneys did not even know that Mottsey had liability insurance. *See supra* note 4, and accompanying text. Welford and Kerrigan did not discover that Mottsey had liability insurance through Liberty until *after* the wrongful death action was filed on August 21st. As of that date, Welford and Kerrigan had already decided that they would not settle for any policy limits that Mottsey might have had. Welford maintains, however (and for purposes of summary judgment I must accept as true), that if he had been contacted by Liberty and learned of the liability coverage at any point *before* he filed the wrongful death case, then he would have settled the claim for policy limits instead of pursuing litigation.

On October 5, 2009, two days after Mottsey was served with the complaint, she called and notified Liberty of the lawsuit. Two days later, on October 7, 2009, she sent the lawsuit papers to Liberty via fax. The following day, Liberty wrote to Mottsey and advised her that a verdict for plaintiff might exceed her policy limits. October 9, 2009, two days after Liberty received a copy of the complaint (and still with no demand or communication from Welford) Liberty initiated settlement discussions by offering the full policy limits of $20,000 globally to all three potential claimants, with the specific apportionment to be decided at a settlement conference before a certified circuit court mediator.[6] The conference was initially scheduled for December 1, 2009, but Welford and Kerrigan refused to participate. Subsequently, on March 8, 2010, Kerrigan wrote a letter to Levin which read in part:

---

**6.** *See generally Mesa v. Clarendon Nat'l Ins. Co.*, 799 F.3d 1353 (11th Cir.2015), regarding apportioned or global settlement offers in multiple claimant cases in Florida.

I will press forward with the case and when they want to talk about bad faith will bring you in. I want a lot of time to go by before anyone looks at this file and figures out they have never offered [the full] $10,000.00 for Middleton, the driver who was speeding and slowing down and preventing the boy who hit the kids from passing.

. . .

On November 2, 2010, Liberty mailed letters and separate checks for $6,666.66 to Kane and to Welford and Shipley's estates, which were each refused. The Estate of Shipley never pursued a claim against Mottsey, and the statute of limitations for it to do so expired. Meanwhile, Kane filed and agreed to settle his claim against Mottsey for her policy's per-person limit of $10,000, but Welford rejected that same offer as he and Kerrigan had already decided that they would not accept any policy limits after the matter was in litigation. Liberty provided Mottsey, Middleton, and Mayhair with attorneys, and the case proceeded to a jury trial.[7]

Mottsey, Middleton, and Mayhair insisted that Middleton was not responsible for the crash and that he and Mayhair were just witnesses. After hearing the evidence, the jury's verdict apportioned the parties' comparative fault as 55% on Rachel, 38% on Middleton, and 7% on Zisa, and it awarded Welford (as the personal representative of Rachel's estate) $1.3 million in damages. Judgment was entered against Milddleton for his (38%) proportional share of $501,600. Based on Florida's vicarious liability caps, the judgment against Mottsey and Mayhair was $100,000, for which they are jointly and severally liable with Middleton. After an unsuccessful appeal, Liberty paid the $10,000 per-person

policy limit, plus prejudgment interest, in partial satisfaction of the judgment.

After the trial and appeal, Kerrigan spoke to Mottsey about pursuing a bad faith case. She testified about their conversation during her deposition in December 2015:

Q: What do you remember talking to him about?

A: Basically he said that Liberty Mutual never paid out on the policy and that would I be willing to get the judgment released from me for the $100,000 if I would, you know, just tell the truth about things, you know, and about the phone call to his investigator—about the phone call that I first made when the investigator—he said, should there have been a claim opened? I said, I guess. I don't know. I didn't think they needed to open a claim, but I wasn't sure what to do and I thought by calling my insurance company that they would know what to do. You know, they insure people in Florida. They know the Florida law.

Mottsey assigned her rights against Liberty to Welford, after which he "stepped into her shoes" and brought this bad faith action in state court. Liberty removed the case to this federal court based on diversity, and it now moves for summary judgment.

## II. APPLICABLE LAW

### A. Summary Judgment Standard

Summary judgment is proper if all the evidence in the record shows that there are no genuine disputed issues of material fact, and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a) and (c). The plain language of

---

7. The car that Zisa was driving at the time of the accident was owned by one of his friends, Lisa J. Garrison, and he was provided with separate counsel through her insurer, Mercury Insurance Company.

Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to prove the existence of an element essential to that party's case, and on which it must bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Summary judgment is inappropriate "[i]f a reasonable factfinder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact[.]" *Allen v. Board of Public Educ. for Bibb Cty.*, 495 F.3d 1306, 1315 (11th Cir.2007). An issue of fact is "material" if it might affect the outcome of the case under the governing law. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). It is "genuine" if the record, viewed as a whole, could lead a reasonable fact finder to return a verdict for the non-movant. Id. "In considering a summary judgment motion, '[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *Trucks Inc. v. United States*, 234 F.3d 1340, 1342 (11th Cir.2000) (quoting *Anderson, supra*).

*B. Bad Faith Law*

■ In diversity cases, federal courts must apply the substantive law of the forum state. *Bravo v. United States*, 577 F.3d 1324, 1325 (11th Cir.2009). Under Florida law, an insurer owes a duty of good faith to its insured. *See Berges v. Infinity Ins. Co.*, 896 So.2d 665, 672 (Fla. 2004). "[T]he purpose of an insurer's obligation to act in good faith is to protect an insured from an excess verdict[.]" *Id.* To fulfill its obligation, "an insurer does not have to act perfectly, prudently, or even reasonably. Rather, insurers must 'refrain from acting solely on the basis of their own

interests in settlement.'" *See Novoa v. GEICO Indem. Co.*, 542 Fed.Appx. 794, 796 (11th Cir.2013) (quoting *State Farm Mut. Auto. Ins. Co. v. Laforet*, 658 So.2d 55, 58 (Fla.1995)); *see also, e.g., Johnson v. Geico General Ins. Co.*, 318 Fed.Appx. 847, 849 (11th Cir.2009) (bad faith is where an insurer acts "in its own best interests to the detriment of the insured") (citing *Macola v. GEICO*, 953 So.2d 451, 458 (Fla. 2006)). Although evidence of negligence can be relevant to establishing bad faith, the "standards for determining liability in an excess judgment case is bad faith rather than negligence." *See Campbell v. GEICO*, 306 So.2d 525, 530 (Fla.1974); *accord, e.g., DeLaune v. Liberty Mut. Ins. Co.*, 314 So.2d 601, 603 (Fla.4th DCA 1975) ("evidence of negligence may be considered by the jury as it may bear on the question of bad faith, [but] a cause of action based solely on negligence which does not rise to the level of bad faith does not lie"). Whether the insurer has acted in bad faith must be analyzed under a "totality of the circumstances" standard. *Berges*, 896 So.2d at 680 (citation omitted).

■ The Supreme Court of Florida announced the standard for insurer good faith almost 40 years ago in *Boston Old Colony Ins. Co. v. Gutierrez*, 386 So.2d 783 (Fla.1980). The Court explained in that case that to exercise good faith in handling a claim against an insured, an insurer must exercise "the same degree of care and diligence as a person of ordinary care and prudence should exercise in the management of his own business." *Id.* at 785. Further, and more specifically:

This good faith duty obligates the insurer to advise the insured of settlement opportunities, to advise as to the probable outcome of the litigation, to warn of the possibility of an excess judgment, and to advise the insured of any steps he might take to avoid the

same. The insurer must investigate the facts, give fair consideration to a settlement offer that is not unreasonable under the facts, and settle, if possible, where a reasonably prudent person, faced with the prospect of paying the total recovery, would do so. *Id.* Notably, these are not "separate duties" but, rather, they are part of the overall duty to act in good faith by settling valid claims within policy limits wherever possible. *See Davidson v. GEICO*, 2010 WL 4342084, at 9 n. 4 (M.D.Fla. Oct 26, 2010), *aff'd* 422 Fed.Appx. 790 (11th Cir. 2011). In sum, "the essence of an insurance bad faith claim is that the insurer acted in its own best interests, failed to properly and promptly defend the claim, and thereby exposed the insured to an excess judgment." *Boateng v. Geico General Ins. Co.*, 2010 WL 4822601, at *2 (S.D.Fla. Nov 22, 2010); *see also Macola*, 953 So.2d at 458 ("the essence of a third-party bad faith cause of action is to remedy a situation in which an insured is exposed to an excess judgment because of the insurer's failure to properly or promptly defend the claim").

Thus, in a typical bad faith case, the insurer was given a time-limited settlement offer or demand by the plaintiff and it refused to settle for coverage limits within that given time, which later resulted in a judgment that exceeded the coverage limits. *See, e.g., GEICO v. Grounds*, 311 So.2d 164 (Fla.1st DCA 1975) (insurer liable for bad faith in auto accident case for not timely responding to demand within policy limits where its insured—who was charged with a DWI—was at fault). Because there was no settlement offer or demand on the facts presented here, this is not the typical bad faith case. Not every case will involve formal settlement offers or demands, however. In *Powell v. Prudential Property & Casualty Insurance Company*, Florida's Third District Court of Appeal recognized an exception to the "typical" bad faith case:

> The lack of a formal offer to settle [by the plaintiff] does not preclude a finding of bad faith .... Bad faith may be inferred from a delay in settlement negotiations which is willful and without reasonable cause. *Where liability is clear, and injuries so serious that a judgment in excess of the policy limits is likely, an insurer has an affirmative duty to initiate settlement negotiations.*

584 So.2d at 14 (citations omitted) (emphasis added).[8]

■ In any type of bad faith case, the insured must prove that the alleged bad faith *caused* the excess judgment. *See, e.g., Novoa*, 542 Fed.Appx. at 795–96; *Maldonado v. First Liberty Ins. Corp.*, 342 Fed. Appx. 485, 487 (11th Cir.2009). While the issue of whether there was bad faith is generally a factual issue for the jury, courts have, in appropriate cases, held as matter of law that the insurance company did not act in bad faith. *See Maldonado*, 342 Fed.Appx. at 485; *Berges*, 896 So.2d at 680; *see also, e.g., Barnard v. Geico General Ins. Co.*, 448 Fed.Appx. 940, 943 (11th Cir.2011) ("Bad faith causes of action generally raise issues of fact for determination by the jury. However, Florida courts have endorsed judgment as a matter of law in cases where the undisputed facts would not support the conclusion that the insurer acted in bad faith.") (collecting multiple cases).

---

**8.** Welford's bad faith expert witness, David Hood, expressly conceded during his deposition that if the accident had occurred "in a jurisdiction that didn't have a *Powell* case"— and a lot of them do not, as many jurisdictions require a formal demand—then Welford would not have a bad faith claim (doc. 61-3 at 61).

## III. Discussion

Preliminarily, I must briefly discuss Liberty's overarching argument that it was always Kerrigan's "goal" to set up this case for bad faith. In making this argument, Liberty points out that it offered the full policy limits within two days of receiving the wrongful death complaint, but Welford and Kerrigan had already made the decision not to settle for policy limits by the time they filed the complaint on August 21, 2009. However, once again, Welford has claimed (and for purposes of summary judgment I accept as true) that he and Kerrigan did not even know that Mottsey had any liability coverage when they initially brought the case. At that time, they were still proceeding under the assumption (based on what Mottsey had previously told Cook) that there was no liability insurance at all. Therefore, accepting that evidence as true, the "goal" could not have been to set Mottsey's insurer up for bad faith because they did not even know that Mottsey had any liability insurance.[9]

 Turning to Liberty's more specific arguments on summary judgment, Welford's entire bad faith claim depends on Mottsey's May 7th phone call to Liberty. He argues that—based solely on that call—Liberty had a duty to investigate the crash. Welford further argues that if Liberty had conducted such an investigation, it would have been required—based on *Powell*—to initiate settlement discussions even in the absence of a formal demand. Liberty moves for summary judgment on the following grounds: (1) the May 7th call did not trigger a duty to investigate, and (2) Liberty was not required to initiate settlement talks because Middleton was not "clearly liable" for the crash. Liberty further argues that no reasonable jury could find bad faith in this case because: (3) it offered to settle for the full policy limits within two days after receiving a copy of the wrongful death complaint, and (4) Mottsey "caused" the excess judgment in the underlying wrongful death case by falsely telling Cook that she did not have liability insurance. Each argument will be addressed in turn.

First, Liberty contends that the May 7th call did not trigger a duty to investigate the accident. Both sides make seemingly strong arguments on this point. On one hand, the record is unchallenged that Mottsey told Liberty that Middleton and Mayhair were "witnesses" who gave statements, but they were otherwise "not involved" in the crash. Welford has cited no case—and my own research has found none—where an insurer committed bad faith by failing to investigate an accident when the insured vehicle was not involved and its own insureds insist they were merely eyewitnesses. On the other hand, as a result of the May 7th call, Liberty knew: (i) that there had been an accident; (ii) that it resulted in at least one death; (iii) and that an investigator with a plaintiff's law firm had called on behalf of a victim and tried to obtain Mottsey's insurance information (which was only a 10/20 policy that would likely be exhausted in a crash involving fatalities).

9. Liberty also highlights Kerrigan's letter to Levin, dated March 8, 2010, wherein Kerrigan says that he plans to pursue a bad faith case and "want[s] a lot of time to go by before anyone looks at this file and figures out they have never offered $10,000.00 for Middleton." However, as Welford has pointed out in his response, that letter was written *after* Kerrigan discovered that Liberty insured Mottsey and that there might be a possible bad faith claim. While the letter may reflect that Kerrigan "want[ed]" the claim to be as strong as possible for the Welfords, it says nothing about whether it was his original "goal" all along.

At first blush, then, the arguments appear to present a close question. However, as Liberty notes in its reply—and as already noted in section II.B, *supra*—the duty to investigate is not a separate stand-alone duty but, rather, it is part of the broader duty to attempt to settle a claim in good faith. *See Davidson*, 2010 WL 4342084, at *9 n. 4. Liberty thus argues:

> Plaintiff's focus on investigation, apart from whether Liberty acted in bad faith vis-a-vis a settlement opportunity, is misplaced. This is a *Powell* case. Plaintiff's expert acknowledges that. Assuming the May 7 call triggered a duty to investigate, the only way that Liberty could have acted in bad faith is if Liberty had "an affirmative duty to initiate settlement negotiations" under *Powell*.

I agree. An insurer's "duty to investigate" does not exist in a vacuum; rather, it is part and parcel of the overall duty to settle a claim within policy limits wherever possible, thereby protecting the insured from a potential excess judgment. The real question is: *did* Liberty have an affirmative duty to initiate settlement discussions under *Powell*? That is Liberty's second argument in support of summary judgment, and it is what this case is really all about.

It is true, of course, that *Powell* holds that an insurer does not have to sit back and wait for a formal demand ("the lack of a formal offer to settle does not preclude a finding of bad faith"), and, consequently, bad faith can exist if the insurer does not attempt settlement on its own ("an insurer has an affirmative duty to initiate settlement negotiations"). However, *Powell* itself cautions that the insurer's affirmative duty to initiate settlement negotiations will exist only "*where liability is clear.*" 584 So.2d at 14 (emphasis added). In *Powell*, for example, the insured's liability (coincidentally, for striking two pedestrians with her car) was evaluated at being somewhere between "80-100%." *See id.* at 13. In this case, by contrast, liability was not anywhere near as certain; in fact, it was debatable whether Middleton had any responsibility *at all*. Not only did Mottsey, Middleton, and Mayhair each dispute liability, but Corporal Davis found that "Middleton is listed as a witness. There [was] no contact with his vehicle. FHP can't prove that he contributed to the accident." Similarly, the investigator at the Levin Papantonio law firm stated on March 23, 2009 (one month after the crash) that "it wasn't clear" if they had a liability claim against Middleton; and then, on April 23, 2009 (two months after the crash), he wrote that "we [still have] no concrete evidence or liability against Middleton." And perhaps most notably, Welford's own bad faith expert witness, David Hood, testified as follows at his deposition (emphasis added):

Q: [I]t's true that the Mayhair/Mottsey vehicle never impacted the Zisa vehicle, correct?

A: As best of the investigation, that's correct.

Q: And the Mayhair/Mottsey vehicle never impacted any of the pedestrians either, right?

A: Yes, correct.

Q: The vehicle that impacted the pedestrians was the one being driven by Mr. Zisa?

A: Yes.

Q: In fact, you have the homicide report there in the white notebook. The homicide investigator determined that fault for the accident was—rested with the pedestrians, correct?

A: That was his opinion, yes.

Q: Because they were wearing dark clothes and walking in the middle of the road at night, correct?

A: Yes, yes.

Q: And, in fact, as this case played out, the jury only found a small percentage of fault on Mr. Middleton for his involvement, correct?

A: Yes.

Q: *Would you agree with me that at, both at that point in time, when the claim initially happened, when the accident initially happened, all the way through the handling of the claim, this was not a case where there was clear liability on the part of Mr. Middleton or Mayhair/Mottsey?*

A: *No, there was no clear liability.*

Welford maintains that it is "absurd" and "nonsensical" to interpret the "clear liability" requirement in *Powell* to mean that the insured must be principally—if not entirely—at fault for the accident. He contends in his memorandum in opposition to summary judgment:

> The undersigned concedes that there is little, if any, case precedent on what constitutes "clear" liability in the context of bad faith claims. That said, common sense dictates that the concept of "clear" liability in the bad faith context includes those accidents in which there is reasonable indicia that the insured could share at least *some* fault for causing the accident. This is especially true in Florida, where the doctrine of "pure" comparative fault has been the law for generations.

Liberty replies that, in advancing this argument, "the Plaintiff tries to have this Court extend *Powell* to create an affirmative duty to initiate settlement negotiations anytime it is possible that the insured could be liable. That ignores, and requires this Court to change, the language in *Powell*." Liberty is correct about the legal application of the "*Powell* rule."

■ On its face, *Powell* does not obligate insurers to initiate settlement negotiations whenever an insured is involved in a crash and has *some* potential liability. Indeed, if that were the law, insurers would have that obligation in virtually every accident case as it is almost always possible that an insured may be found at least *partially* liable for an injury.[10] But that is not what the *Powell* Court said. Rather, at the risk of repetition, *Powell* speaks specifically about an insurer's responsibility when its insured's liability is clear, which generally means: "Free from doubt; sure. Unambiguous." *See* Black's Law Dictionary (10th ed. 2014); *Dianderas v. Florida Birth Related Neurological*, 973 So.2d 523, 527 (Fla.5th DCA 2008) (providing other dictionary definitions of "clear," including "obvious; beyond reasonable doubt; ... plain; evident; free from doubt or conjecture, unequivocal").

Thus, in both post-*Powell* cases that Welford has cited, the insured's liability was readily apparent and not in dispute. In *Goheagan v. American Vehicle Ins. Co.*, 107 So.3d 433 (Fla.4th DCA 2013), John Perkins was drunk and driving at a high rate of speed when he rear-ended and killed Molly Swaby. The Fourth District Court of Appeal held that Perkins's insurer was required under *Powell* to initiate settlement (for a 10/20 policy) without waiting for a formal demand because the adjuster on the file investigated the crash and, within a few days thereafter, "concluded that Perkins was the *sole cause* of the accident, Swaby's injuries were far in

---

**10.** Indeed, under the necessary logic of Welford's position, as long as there exists a potential for a defendant to be found as little as 1% liable for an accident (for which a plaintiff may recover in a pure comparative fault state like Florida), then an insurer has the affirmative obligation to start settlement talks, even in the absence of a formal demand, claim, or communication from the injured party.

excess of the policy limits, and the claim should be settled." *See id.* at 435 (emphasis added). In the court's own words, the insured had *"clear liability." See id.* at 439 (emphasis added). Similarly, in *Snowden v. Lumbermens Mut. Cas. Co.*, 358 F.Supp.2d 1125 (N.D.Fla.2003), the jury found that the insurer, Lumbermens Mutual Casualty Company, was liable for bad faith in failing to initiate settlement under *Powell* where "liability was clear from the outset and known to Lumbermens." *Id.* at 1128. Plainly, *Goheagan* and *Snowden* bear little resemblance to this case since Middleton's liability for the accident was far from "clear," notwithstanding that a reasonable jury could (and ultimately did) find him 38% responsible.[11]

Welford impliedly recognizes that he has no case law support for his position, but he suggests there is no case law to the contrary. That's not completely true. In *Shin Crest PTE Ltd. v. AIU Ins. Co.*, 605 F.Supp.2d 1234 (M.D.Fla.2009), *aff'd* 368 Fed.Appx. 14 (11th Cir.2010), Doreen Blair was sitting in a chair manufactured by Shin Crest when she fell off and into a dry lake-bed. She was rendered a paraplegic, after which she filed a products liability suit against Sam's Club, the retailer that sold the chair. Shin Crest had a $2 million liability policy through AIU Insurance Company. Since Sam's Club was named as an additional insured under the policy, AIU provided it a defense. The insurer did not believe that it had any liability for the injury as it did not believe that the chair was defective, and its expert witness, Clyde Richard, agreed. Nevertheless, AIU was concerned that "if the jury liked Mrs.

Blair," it could find her 80% at fault and Sam's Club 20% liable "due to juror sympathy." The insurer thus put an estimated value on the case of somewhere between $1–1.5 million. The case then proceeded to pre-trial mediation (which Shin Crest attended, even though it was not a named defendant at that time), but AIU (acting on behalf of the additional insured, Sam's Club) only offered a settlement valued at $625,000, which the plaintiff rejected. AIU eventually settled the case against Sam's Club for $1.8 million (the policy was an eroding policy, and that was all that remained), after which Blair brought an action against Shin Crest. Because the policy limits had already been exhausted, AIU refused to defend Shin Crest in the second lawsuit. Blair and Shin Crest then entered into a stipulated judgment for $12 million, in which Blair agreed to not try and collect from Shin Crest as long as Shin Crest pursued a bad faith action against AIU, with Blair sharing in any damages awarded.

The crux of the bad faith claim was that AIU should have offered the *full* policy limits at the mediation in exchange for a release of Blair's claims against *both* Sam's Club and Shin Crest, and that, by not doing so, AIU had failed to protect Shin Crest. In granting summary judgment for AIU and holding that *Powell* did not require the insurer to offer policy limits for both Sam's Club and Shin Crest, the district court stated, in relevant part:

> AIU acknowledges that *Powell* stands for the proposition that when liability is clear and injuries are so serious that a judgment in excess of the policy

---

11. To perhaps better illustrate this point, consider the claim against Zisa. The investigation found that he was unimpaired and driving at a "reasonable speed" when he tried to pass Middleton in a marked passing zone, and yet the jury found him partially liable. It would be absurd, however, to suggest that liability against him was "clear," even though he was eventually found to have been 7% responsible for the accident. But, according to Welford's argument, liability against him was indeed "clear" since there was indicia that he had at least *some* fault.

limits is likely, an insurer has an affirmative duty to initiate settlement negotiations. *See Powell,* 584 So.2d at 14 (citation omitted). *However, AIU points out that the instant case is distinguishable from Powell in that Shin Crest's liability was not clear at the time of the mediation (or ever).* Shin Crest denied that the chair was defective, and Richard, the defense expert, opined that the chair was not defective and was not the cause of the accident. . . .

Shin Crest focuses on the fact that Mrs. Blair's injuries were very serious and potential damages could far exceed the policy limits. While this is certainly a factor an insurance company must consider, *this factor is not determinative when liability is not clear.*

*Id.* at 1241 (emphasis added).[12]

■ In conclusion, *Powell* holds that an insurance company is obligated to initiate settlement discussions in a probable excess case even if there is no formal demand, but that obligation exists only if "liability is clear." 584 So.2d at 14. It is not necessary for me to determine what constitutes "clear" liability in percentage terms; *i.e.,* whether the potential liability must be between 80-100% (as it was in *Powell*), or something less, such as a mere preponderance threshold (51% or more). I need only say that, by any objective measure, liability was not "clear" on the facts of this case, as the FHP officer investigating the crash, the investigator employed by Welford's original attorney, and his own expert witness all expressed serious doubt and misgivings about Middleton's liability for the accident (not to mention that Mottsey, Middleton, and Mayhair each denied fault outright). Consequently, I conclude as a matter of law that Liberty did not commit bad faith by failing to initiate settlement discussions after the May 7th call.

Liberty's two remaining arguments can be addressed briefly. Because I have concluded that the May 7th call did not by itself trigger a duty to initiate settlement in the absence of a formal settlement offer, demand, claim, or any communication from Welford, no reasonable jury could find that Liberty acted in bad faith on the facts of this case. There is simply no evidence in the record that Liberty put its own interests ahead of its insured. To the contrary, within two days of receiving the wrongful death complaint, Liberty globally offered full policy limits to the three potential claimants. Even assuming *arguendo* that Liberty should have followed up on the May 7th call and investigated the crash sooner, that was at most negligence—and negligence is not bad faith. *See Campbell,*

---

**12.** It bears noting that Shin Crest appealed to the Eleventh Circuit, where the first argument in its brief was: "I. THE AFFIRMATIVE DUTY TO SETTLE IS NOT CONFINED TO CASES WHERE THE INSURED HAS CLEAR LIABILITY." Appellant's Brief, 2009 WL 6326328, at *26 (11th Cir. Sept. 25, 2009). Shin Crest argued that AIU and the district court had incorrectly read the *"Powell* rule" to apply only when liability was undisputed, when, in fact, the insurer is required to initiate settlement discussions even if an insured's liability is as little as 20%, as it was in *Shin Crest. See id.* at 26–27, 30. In other words, Shin Crest argued—much as Welford does here—that as long as there is a chance that an insured could be found to share *"some fault"* for an injury in an excess case, that is sufficient to obligate the insurer to initiate settlement discussions in the absence of a formal demand. Although the Eleventh Circuit did not specifically address this argument (or even cite to *Powell*), it arguably rejected it *sub silentio* as it affirmed the district court on an alternative ground. *Shin Crest PTE Ltd. v. AIU Ins. Co.,* 368 Fed.Appx. 14 (11th Cir. 2010). In any event, to be clear, I am relying on the district court opinion in *Shin Crest,* and not on the unpublished circuit opinion that affirmed it.

306 So.2d at 530; *DeLaune*, 314 So.2d at 603.

And finally, Liberty contends that even if there was bad faith, Welford has not established (and cannot establish) that the bad faith *caused* the excess judgment as it was Mottsey—in whose shoes Welford now stands—who was responsible for the claim not settling pre-suit. As to this argument, it is undisputed that Mottsey refused to tell Cook the name of her insurance company and, further, it appears that she falsely told him (either explicitly or by implication) that she did not have liability coverage. Cook testified that if Mottsey had told him the name of her insurer, the law firm would have reached out to them and tracked her policy down. Based on the speed with which Liberty offered the full liability limits after receiving the lawsuit, it seems likely that Liberty would have also offered those limits pre-suit if Levin and/or Kerrigan had contacted them to discuss the facts of the accident (particularly if they threatened suit). And, according to Welford, he would have agreed to settle for the policy limits at any time *before* the lawsuit was filed, but that did not happen because of what Mottsey had told Cook. In other words, Liberty says that Mottsey received the insurance coverage that she had purchased, that she herself caused the excess judgment, and that there is no evidence of a causal relationship between the excess judgment and anything that Liberty did (or did not do).

Welford responds by stating that even though Mottsey may share "*some* fault because she misrepresented her insurance coverage to Mr. Cook, her role in the causal chain is wholly immaterial because she promptly reported the accident to Liberty and the fact that a plaintiff's attorney's investigator was inquiring about the accident and her insurance coverage ... was sufficient to break the causal chain of

any fault she might share." Thus, in making this argument, Welford is once again suggesting that the May 7th call was sufficient to trigger a duty to investigate the crash and voluntarily propose settlement in the absence of a formal demand or any communication from the claimant(s). The evidentiary support for this position is very weak and tenuous given that the insured car "was not involved in the crash." While it is perhaps *possible* that a jury could find that there was a causal connection between Liberty's conduct and the excess judgment, to do so it would have to find from a totality of the record evidence that Mottsey's own conduct should be given little or no weight, and that Liberty's failure to "discover" possible negligence on the part of its insured was what "caused" Mottsey's excess judgment. Reasonable jurors would not be expected to do that.

Nevertheless, I do not have to definitively decide the issue. As noted, Welford opposes Liberty's lack of causation argument exclusively on the ground that Liberty had an affirmative duty to investigate the crash and then offer to settle the (potential) claim based on the May 7th call, which I have rejected for the reasons noted above.

## IV. Conclusion

The defendant's motion for summary judgment (doc. 45) is hereby GRANTED. Judgment shall be entered in favor of the defendant, along with taxable costs, and the Clerk is directed to close this case.

DONE and ORDERED this 2nd day of June 2016