CANADY, C.J., dissenting.
The Fourth District's decision in GEICO General Insurance Co. v. Harvey , 208 So.3d 810 (Fla. 4th DCA 2017), does not expressly and directly conflict with this Court's decisions in Boston Old Colony Insurance Co. v. Gutierrez , 386 So.2d 783 (Fla. 1980), or Berges v. Infinity Insurance Co. , 896 So.2d 665 (Fla. 2004), "on the same question of law." Art. V, § 3(b)(3), Fla. Const. Because this Court lacks jurisdiction, I dissent from the majority's failure to discharge this case.
Indeed, the only conflict here is between the majority's decision and the prior precedents of this Court. Under a proper reading of Boston Old Colony and Berges , the Fourth District's decision should be approved. The evidence here, when viewed in the light most favorable to the insured, James Harvey, is legally insufficient to support a verdict against Harvey's automobile *13 insurer, GEICO, for bad faith failure to settle the third party's claim within Harvey's $100,000 policy limits. GEICO-who tendered the policy limits within days of the fatal accident and stood ready and willing to settle-should not be liable for the $8,470,000 of damages caused by Harvey. In reinstating this punitive, extracontractual award, the majority mischaracterizes certain relevant facts, relies on certain unsupported assumptions, and misreads our case law as standing for the proposition that an insured's own actions are irrelevant in any bad faith action.
The majority paints the picture that Harvey only had $85,000 of assets, that he agreed to provide his financial information to the estate's attorney, and that the wrongful death suit against Harvey would have settled for the $100,000 policy limits if only GEICO had informed the estate's attorney that Harvey was working on providing the information. The record reveals that Harvey and his wife had assets well in excess of $1 million, Harvey was already discussing his coverage and assets with potential legal counsel on the day of the accident, Harvey provided his asset information to his personal attorney three weeks before suit was filed, Harvey and his attorney knew of the estate's attorney's request for information, and Harvey never once offered to provide the information. It is not that the Fourth District erroneously "blamed Harvey for failing to do more to avoid the excess judgment." Majority op. at 10. Rather, it is that Harvey and his attorney-not GEICO-controlled the only relevant decision that needed to be made.
Although GEICO's claims agent handled the claim less than perfectly, negligent claims handling does not equate to bad faith. Campbell v. Gov't Employees Ins. Co. , 306 So.2d 525, 530 (Fla. 1974). The majority's decision to reinstate the jury verdict muddies the waters between negligence and bad faith and bolsters "contrived bad faith claims." Berges , 896 So.2d at 686 (Wells, J., dissenting). Indeed, the estate's attorney was permitted to testify that GEICO was in bad faith a mere six days after the accident. I thus echo Justice Wells' dissenting view in Berges that it is not "acceptable for the Court to merely say that bad faith is a jury question." Id. This Court should set forth "logical, objective" rules for bad faith. Id. And it should not sanction the award of "limitless insurance," id. , in a case in which the insurer tendered the policy limits, the third party never made any time-limited demand or presented any settlement offer of its own, and the only relevant decision to be made was within the insured's control.
I. Jurisdiction
The majority's determination of jurisdiction appears to be based on the conclusion that Harvey misapplied Boston Old Colony as merely setting forth a bad faith "checklist," majority op. at 10, and that Harvey misapplied Berges by considering Harvey's "own actions or inactions ," majority op. at 3 (quoting Harvey , 208 So.3d at 816 ). But the majority's finding of misapplication conflict is grounded in the majority's misreading of our case law.
Boston Old Colony
In Boston Old Colony , the injured third party sued the insured's automobile insurer for bad faith failure to settle the third party's claim within the insured's $10,000 policy limits. Boston Old Colony , 386 So.2d at 784-85. Of relevance, the investigating officer concluded that the insured caused the collision, the third party's injuries "were extensive," the third party actually offered to settle for the insured's $10,000 policy limits, and the insurance company recommended that the insured settle the case, but the insured requested that the insurance company not settle due to the insured's pending counterclaim. Id. at 784.
*14 The insurance company ultimately chose to not settle and went so far as to obtain a "hold harmless" agreement from the insured. Id. After the parties settled the insured's counterclaim, the insurance company offered the $10,000 policy limits in settlement of the third party's claim, but the third party opted to proceed to trial and obtained a judgment against the insured in the amount of $1,400,000. Id. The third party then sued the insurance company for bad faith, alleging failure to settle "when [the insurance company] had the opportunity." Id. at 784-85. The third party prevailed in a jury trial and obtained a judgment against the insurance company in the amount of $1,400,000. Id. at 785.
On appeal, the insurance company argued that the trial court erred in denying its motion for directed verdict. The Third District rejected that argument, "holding that there was sufficient evidence upon which a jury could base a verdict of bad faith failure to settle." Id.
On review, this Court quashed the Third District's decision. Id. at 786. Despite noting that the question of bad faith "is for the jury," this Court concluded that no "reasonable jury" could have reached a verdict of bad faith failure to settle. Id. at 785. In doing so, this Court described the insurer's duty of good faith in general terms before laying out certain specific obligations an insurer is required to fulfill in the context of injuries caused by its insured to a third party:
This good faith duty obligates the insurer to advise the insured of settlement opportunities, to advise as to the probable outcome of the litigation, to warn of the possibility of an excess judgment, and to advise the insured of any steps he might take to avoid same. The insurer must investigate the facts, give fair consideration to a settlement offer that is not unreasonable under the facts, and settle, if possible, where a reasonably prudent person, faced with the prospect of paying the total recovery, would do so.
Id. (citation omitted). This Court then concluded that the evidence demonstrated that the insurance company "fulfilled all these obligations." Id.
In justifying its decision, this Court specifically noted the relevance of the insured's own actions. Id. at 785-86. The Court recounted that the insured "at all times contested liability," requested the insurer "not to settle the claim because he was pursuing a counterclaim against [the] plaintiff," and "executed a 'hold harmless' agreement ... assum[ing] responsibility for any excess judgment." Id. This Court did so despite earlier explaining that the insurance company has "all control over the handling of the claim, including all decisions with regard to litigation and settlement," and that the insurance company has a duty to "settle, if possible, where a reasonably prudent person, faced with the prospect of paying the total recovery, would do so." Id. at 785. This Court ultimately determined that the failure to settle was "because of the explicit request of its own insured." Id. at 786. This Court also noted the relevance of the third party's own actions, namely the third party's "refus[al] to settle when the insurer subsequently offered to settle prior to trial." Id.
Harvey does not expressly and directly conflict with Boston Old Colony on any question of law. Harvey recognized the controlling relevance of Boston Old Colony , examined the facts in light of the obligations set forth in Boston Old Colony , and concluded that, even though GEICO could have handled the claim better, the evidence showed that GEICO fulfilled the Boston Old Colony obligations. Harvey , 208 So.3d at 814-15. In Boston Old Colony , we held that the insurer's motion for directed *15 verdict should have been granted because the evidence showed that the insurer "fulfilled all these obligations" and stood "ready" and "willing[ ] to settle" for the policy limits. Boston Old Colony , 386 So.2d at 785-86. The district court in Harvey reached the very same conclusion.
Berges
The majority's asserted basis for misapplication conflict with Berges rests squarely on the majority's disagreement with the Fourth District's decision to consider Harvey's own actions. Even assuming that the complained-of analysis in Harvey is not dicta, there is no express and direct conflict.
The majority repeatedly cites the following language from Berges : "the focus in a bad faith case is not on the actions of the claimant but rather on those of the insurer in fulfilling its obligations to the insured." E.g. , majority op. at 11 (quoting Berges , 896 So.2d at 677 ). The majority interprets this language as standing for the proposition that the sole focus in any action for bad faith failure to settle must be on the insurer's actions-to the exclusion of all else. But the majority overlooks that Berges cited Boston Old Colony as support for that very language. See Berges , 896 So.2d at 677. As just explained, Boston Old Colony itself specifically noted the relevance of the insured's own actions, as well as those of the third-party claimant. Boston Old Colony , 386 So.2d at 785-86. And the Berges Court emphasized that it was not departing from Boston Old Colony : "we have not attempted to alter bad faith jurisprudence." Berges , 896 So.2d at 682. Harvey thus stayed well within the bounds of our precedent by focusing on GEICO's conduct while also considering, for example, that "the estate never provided any deadline or other timeframe within which th[e] statement was to be provided," or that "despite the insured knowing the estate wanted a statement, neither the insured nor his attorney took any further action to provide the estate with a statement." Harvey , 208 So.3d at 813.
II. The Majority's Substantive Decision
The result of the majority's decision is that an insured who caused damages that exceeded his policy limits by over 8,000 percent, who had assets that greatly exceeded his policy limits, and who at no time ever offered to provide his financial information to the third-party claimant despite knowing that the information was being requested even after the policy limits were tendered, has his $100,000 policy converted into an $8.47 million policy, while other insurance customers eventually foot the bill. Our case law does not support this result.
Because the majority asserts that the Fourth District failed to view the evidence in the light most favorable to Harvey, see majority op. at 9, and because the majority glosses over critical aspects of the record, I first review the timeline of events. Ultimately, the only disputed events of any potential relevance occurred on two days-August 14 and 31, 2006. But even viewing those events in the light most favorable to Harvey, GEICO should be entitled to judgment as a matter of law.
The Proceedings Below
On August 8, 2006, James Harvey, who was insured by GEICO for $100,000 and whose vehicle was registered in his name and his business's name, caused the accident that resulted in the death of John Potts. GEICO's adjuster, Fran Korkus, promptly interviewed Harvey. On this same day, Harvey called a local attorney and discussed his insurance coverage and *16 assets.[4] Although Harvey did not hire this attorney, Harvey was obviously concerned about his exposure to a lawsuit. After all, he and his wife had well over $1 million in assets.
On August 11, Korkus spoke with Harvey and sent him a letter explaining his policy limits, advising him of the possibility of excess exposure, and advising him of his right to retain his own attorney to protect his rights regarding excess exposure. Later this same day, Harvey retained a personal attorney-the attorney for Harvey's business.
On August 14, Vivian Tejada, a paralegal for the law firm retained by Mrs. Potts, called Korkus. Korkus's notes reveal that Tejada advised Korkus of the law firm's involvement in the case and that a letter of representation would be forthcoming. The remaining events surrounding this call are in dispute. Viewing the disputed facts in the light most favorable to Harvey, it should be assumed that Korkus declined "at this time" Tejada's request to make Harvey available for a statement that would include his asset information. However, it is also undisputed that Tejada never gave a deadline or informed Korkus that the statement was a prerequisite to settling the claim.
Within one hour of her call with Tejada, Korkus called Harvey. Korkus's contemporaneous notes indicate that she "updated [Harvey] on claim status" and informed him about the specific law firm retained by Mrs. Potts. The remaining events surrounding this call are in dispute. Accepting Harvey's "best of my recollection" testimony, it should be assumed that Korkus did not mention that Tejada had asked about other insurance coverage and Harvey's assets.
Three days later, on August 17, it is undisputed that Harvey gathered all of his asset information and set up a meeting with his attorney to take place on August 23 in Fort Myers. Interestingly, when asked at trial about the stack of documents related to his finances that he provided to his attorney, Harvey explained: "I had collected up anything that I thought might be relevant to any question that might be asked and having no idea what is meant by a statement, nor what was being asked for or anything else, decided that it's much better to provide more information than less information." (Emphasis added.) Harvey later testified that GEICO's August 11 excess-exposure letter was the sole reason why he set up the meeting with his attorney. In any event, Harvey's actions leave little doubt that he remained worried about his financial exposure.
Also on August 17, GEICO unconditionally tendered the $100,000 policy limits, along with an affidavit of coverage and a proposed release. GEICO's activity log contains multiple entries indicating that GEICO had to first contact the estate's law firm because the law firm had not yet provided GEICO with a letter of representation confirming the law firm's involvement in the case.
On August 23, Harvey took his financial information and met with his attorney. Testimony revealed that Harvey owned certain liquid assets exceeding $900,000, plus four motor vehicles and two houses. The estate's attorney testified that in his view, the only asset available to the estate as "collectible" was $85,000 in the operating account of Harvey's business. The estate's attorney also testified that he would have recommended settling the case for the $100,000 policy limits had Harvey's asset information been provided, and Mrs. *17 Potts testified that she would have deferred to the estate's attorney.
On August 31, Korkus received a letter with the estate's attorney's response to GEICO's tender of policy limits. In this letter dated August 24, the estate's attorney stated that he "will discuss [GEICO's offer] with my client" while noting that Korkus had "declined" Tejada's "offer" on August 14 that Harvey be made available for a statement. Korkus forwarded a copy to Harvey, spoke with Harvey, and, at Harvey's request, forwarded a copy to Harvey's attorney. Korkus also forwarded a copy to Tim Holleran, a GEICO home office attorney. On Holleran's advice, Korkus contacted the estate's attorney to obtain more information regarding the requested statement. The events surrounding Korkus's call with the estate's attorney are also in dispute. Korkus's notes specifically reflect that she "advised [the estate's attorney] I will contact [Harvey]" and pass the information along "so he can decide." The estate's attorney testified that Korkus never indicated she was going to forward the information to Harvey.
Even accepting the estate's attorney's testimony over Korkus's specific and contemporaneous notes, it is undisputed that Korkus called Harvey shortly after she spoke with the estate's attorney. Korkus's notes from her call with Harvey reflect that she "advised [Harvey] of my conversation [with the estate's attorney] & what info [the estate's attorney] wants to cover in a statement." Korkus also documented that Harvey was going to discuss the statement request with his personal attorney. The accuracy of Korkus's notes from her call with Harvey are not in dispute.
Later that same evening of August 31, the estate's attorney faxed a letter to Korkus memorializing their conversation from earlier in the day. In this second letter, he reiterated their interest in obtaining information from Harvey while noting that Korkus was "unable to confirm" Harvey's availability. Nothing in this letter suggests that Korkus refused to make Harvey available, that any time-limited demand was made, or that any conditions were imposed under which a settlement within the policy limits would be effectuated.
On Friday, September 1, Korkus discussed the second letter with Harvey and sent him a sample form for providing some of the requested information. Harvey informed Korkus that his attorney was not available until after the holiday weekend and that he wanted to speak to his attorney about whether to provide a statement. Harvey also expressed concern about the two letters and did not want the estate's attorney to think they were "not acting fast enough." Rather, he wanted the estate's attorney to know that they were "working on this." GEICO's home office attorney also recommended that Korkus follow up with the estate's attorney regarding her conversation with Harvey. For unexplained reasons, Korkus did not do so.
On September 11, the estate's attorney discussed bad faith law with Mrs. Potts and recommended that she file suit against Harvey. Indeed, the estate's attorney later testified at the bad faith trial that GEICO was in bad faith on August 14-a mere six days after the accident. And yet on August 14, it appears the law firm had not even provided GEICO with a letter of representation.
Finally, on September 13, the wrongful death suit was filed against Harvey, eventually resulting in an $8.47 million judgment against him and leading to Harvey's suit against GEICO for bad faith failure to settle. During the bad faith trial, the jury heard that among other things: (1) Mr. Potts had been killed; (2) the estate obtained a judgment against Harvey for $8.47 million; (3) Harvey only had $100,000 *18 of insurance coverage and purportedly only had collectible assets of $85,000; and (4) if a verdict of bad faith was rendered against GEICO, the $8.47 million judgment against Harvey would be satisfied, with all of the money going to the estate. It was also revealed that in the nine years from the day of the accident, Harvey had never once offered to provide a statement of his assets, and the estate had not attempted to collect a single penny from Harvey.
The Law of Bad Faith
In the context of claims for third-party injuries caused by an insured, this Court in Boston Old Colony described an insurer's duty to its insured as a general "duty to use the same degree of care and diligence as a person of ordinary care and prudence should exercise in the management of his own business." Boston Old Colony , 386 So.2d at 785. This Court then laid out certain specific obligations an insurer is required to fulfill:
This good faith duty obligates the insurer to advise the insured of settlement opportunities, to advise as to the probable outcome of the litigation, to warn of the possibility of an excess judgment, and to advise the insured of any steps he might take to avoid same. The insurer must investigate the facts, give fair consideration to a settlement offer that is not unreasonable under the facts, and settle, if possible , where a reasonably prudent person, faced with the prospect of paying the total recovery, would do so.
Id. (emphasis added) (citation omitted). More recently, this Court in Berges described an insurer's duty to its insured as a "fiduciary obligation to protect its insured from a judgment exceeding the limits of the insurance policy." Berges , 896 So.2d at 668. Although Boston Old Colony did not refer to such a "fiduciary obligation," Berges makes clear that it was attempting to follow the principles set forth in Boston Old Colony and was "not attempt[ing] to alter bad faith jurisprudence." Id. at 682. Thus, nothing in this Court's case law suggests that Boston Old Colony is no longer good law.
As explained above, Boston Old Colony concluded-as a matter of law-that the insurance company could not be liable for bad faith failure to settle, even though the insurance company refused an offer to settle for the insured's $10,000 policy limits, and the extensively injured third party later obtained a judgment against the insured for $1,400,000. Boston Old Colony , 386 So.2d at 785. We did so because the insurance company "fulfilled all [of its] obligations" of investigating, advising, and warning, and was "ready" and "willing[ ] to settle" for the policy limits. Id. at 785-86. We also noted the relevance of the actions of both the insured and the third party. Id.
In a well-reasoned decision, the Fourth District in Harvey explained why GEICO satisfied all of its obligations under Boston Old Colony and should have similarly been entitled to a directed verdict. The majority here understandably does not take issue with the Fourth District's analysis of the specific Boston Old Colony obligations. Indeed, it cannot reasonably be said that GEICO failed to satisfy any of those obligations. GEICO "investigate[d] the facts," advised Harvey "as to the probable outcome of the litigation," warned Harvey "of the possibility of an excess judgment," and advised Harvey of "steps he might take to avoid same." Boston Old Colony , 386 So.2d at 785. Those steps included advising Harvey of his right to retain a personal attorney to protect his rights regarding excess exposure and later advising Harvey that the estate was requesting a statement, while explaining to Harvey what was being requested. The decision as to whether to *19 provide the statement, of course, was Harvey's to make, not GEICO's. After all, an insurer has no duty to undertake a legal analysis of its insured's financial position. Finally, it cannot be said that GEICO failed "to initiate settlement negotiations" in this case "[w]here liability [was] clear," the injuries were fatal, and "a judgment in excess of the policy limits" was not only "likely" but virtually inevitable. Powell v. Prudential Prop. & Cas. Ins. Co. , 584 So.2d 12, 14 (Fla. 3d DCA 1991). Indeed, it is undisputed that GEICO made the one and only settlement offer in this case. That alone should decide this particular case as a matter of law. See Novoa v. GEICO Indem. Co. , 542 F. App'x 794, 796 (11th Cir. 2013) ("[W]e find it hard to imagine how [the insurer] acted in bad faith when it offered to pay everything it possibly could under the policy.").
Rather than take issue with the Fourth District's analysis of the specific Boston Old Colony obligations, the majority points to the Fourth District's purported failure to focus on the more general language in Boston Old Colony regarding an insurer's duty to use "the same degree of care and diligence as a person of ordinary care and prudence should exercise in the management of his own business." E.g. , majority op. at 10 (quoting Boston Old Colony , 386 So.2d at 785 ). In doing so, the majority completely divorces that general language from the specifically enumerated obligations and effectively adopts a negligence standard for bad faith actions, even though negligent claims handling does not amount to bad faith failure to settle. See Campbell , 306 So.2d at 530 (noting that the "standard[ ] for determining liability in an excess judgment case is bad faith rather than negligence"); see also Auto Mut. Indem. Co. v. Shaw , 134 Fla. 815, 184 So. 852, 858 (Fla. 1938) (noting that bad faith involves "a heavier burden upon the insured" than does negligence). Indeed, under the majority's misreading of Boston Old Colony , the jury in that case should have been permitted to decide whether "a person of ordinary care and prudence" would have similarly refused the offer from the injured third party to settle for the insured's meager $10,000 policy limits. But this Court decided Boston Old Colony as a matter of law because the insurance company fulfilled its specific obligations and stood ready and willing to settle, notwithstanding that a settlement was never consummated. The point is, there must be a bad faith failure to settle within the policy limits, not just a "dropp[ing of] the ball," majority op. at 8, at some point during the claims process.
The majority compounds its misreading of Boston Old Colony by misreading and unduly emphasizing the following language from Berges : "the focus in a bad faith case is not on the actions of the claimant but rather on those of the insurer in fulfilling its obligations to the insured." E.g. , majority op. at 10 (quoting Berges , 896 So.2d at 677 ). The majority interprets this language as standing for the unsupportable proposition that the actions of the insured and the third-party claimant are irrelevant in any suit for bad faith failure to settle. But Berges cited Boston Old Colony as support for that "focus" language. Berges , 896 So.2d at 677. And Boston Old Colony clearly considered the insured's own actions, as well as those of the third-party claimant. Boston Old Colony , 386 So.2d at 785-86. Indeed, the specific obligations enumerated in Boston Old Colony themselves contemplate the relevance of the insured's actions. Id. at 785 (explaining that the insurer has a duty "to warn of the possibility of an excess judgment, and to advise the insured of any steps he might take to avoid same" (emphasis added) ). Neither Boston Old Colony nor Berges *20 require (or permit) ignoring the actions of Harvey and the estate.
As it relates to Harvey, the uncontroverted evidence shows that: (1) Harvey and his attorney knew that the estate was requesting certain information from Harvey even after the policy limits were tendered; (2) Harvey provided the necessary information to his attorney three weeks before suit was filed; and (3) at no time-before or after suit was filed-did Harvey or his attorney offer to provide the information. Indeed, "neither [Harvey] nor his attorney took any further action to provide the estate with a statement." Harvey , 208 So.3d at 813. The majority's inattention to these salient facts is wholly unwarranted.
The estate's conduct is also relevant to explaining why GEICO should prevail as a matter of law. For example, just as the third-party claimant did in Boston Old Colony , the estate here "refused to settle" for the offered policy limits. See Boston Old Colony , 386 So.2d at 786. Moreover, unlike the third-party claimant in Berges , the estate here never once presented "a valid opportunity to settle." Berges , 896 So.2d at 675. Despite testifying nine years after the fact that he would have recommended settlement if Harvey had disclosed his asset information, the estate's attorney never once demanded the information, imposed any deadline, or presented any conditions under which a settlement would be effectuated within the policy limits. In other words, the estate never indicated it would accept the policy limits and forego pursuing a judgment if Harvey's immediately "collectible" assets were less than $100,000. In the end, GEICO presented the one and only settlement opportunity in this case.
Turning a blind eye to the wildly speculative nature of this bad faith claim, the majority not only ignores the conduct of Harvey and the estate but also relies on unsupported assumptions. For example, the majority notes that statement requests from plaintiffs' attorneys are "standard practice." Majority op. at 9. From there, the majority comfortably assumes that insureds routinely agree to such requests. See majority op. at 9 (noting that GEICO should "have done everything possible to comply with the estate's reasonable demands"). But there is nothing in the record indicating that insureds-let alone insureds who cause catastrophic damages far exceeding their policy limits and whose assets far exceed those same policy limits-routinely provide their financial information to and sit for recorded interviews conducted by plaintiffs' attorneys. Indeed, Harvey's own actions expose the unreasonableness of the majority's assumption.
By adopting a negligence standard in all but name, ignoring the controlling conduct of the insured and the third-party claimant, and relying on unsupported assumptions, the majority incentivizes a rush to the courthouse steps by third-party claimants whenever they see what they think is an opportunity to convert an insured's inadequate policy limits into a limitless policy. But under a proper reading of our bad faith jurisprudence, GEICO is entitled to judgment as a matter of law. Any shortcoming on the part of GEICO in this case amounts to negligent claims handling, at most. GEICO promptly tendered the policy limits, the estate never made any demand-time-limited or otherwise-or presented any concrete conditions under which it would agree to settle for the policy limits, and Harvey never once offered to provide the supposedly critical personal information despite having that information available and knowing that it had been requested.
III. Conclusion
The majority's determination of jurisdiction rests on the majority's own misreading *21 of our case law. Because this Court lacks jurisdiction, I would discharge this case. The Fourth District correctly decided to reverse the trial court's denial of GEICO's motion for directed verdict. Viewing the facts in the light most favorable to the insured, no reasonable jury could reach a verdict of bad faith failure to settle within policy limits in this case. Finding bad faith in the circumstances presented here works a vast and unwarranted expansion of liability for bad faith claims. In Florida law, mere negligence has now become bad faith. I strongly dissent from this unjustified change in the law.
POLSTON and LAWSON, JJ., concur.

It appears that the local attorney with whom Harvey spoke worked for the same law firm that Mrs. Potts ended up hiring in the suit brought against Harvey.